[Crim. No. 2394. Second Appellate District, Division Two.—May 28, 1934.]

THE PEOPLE, Respondent, v. JOHN C. THORN, Appellant.

Halverson & Halverson for Appellant.

U. S. Webb, Attorney-General, Frank Richards, Deputy Attorney-General, Buron Fitts, District Attorney, John Barnes and A. H. Van Cott for Respondent.

ARCHBALD, J., *pro tem.*—An information was filed against defendant by the district attorney of Los Angeles County containing seven counts charging forgery, nine charging fraud in keeping the books of a corporation and two charging the presenting of false claims of insurance. Count XIV was dismissed, and the jury returned verdicts of guilty on counts III and V (forgery), counts VIII,. IX, X, XI, XII, XIII, XV, XVI (fraud in keeping corporate books) and counts XVII and XVIII (presenting false claims of insurance), and of not guilty on the remaining counts. From the judgments entered on said verdicts of guilty and from the orders denying his motions for a new trial, defendant has appealed.

The trial lasted eleven weeks and the record before us consists of the reporter's transcript of 5,356 pages and the clerk's transcript of 384 pages. The exhibits introduced are listed on 32 pages of the clerk's transcript. Under the circumstances even a very incomplete statement of the facts must suffice, for a complete statement would take more space here than can be given.

Defendant came to Los Angeles from Canada and organized California Thorn Cordage, Inc., in 1924, which company engaged in the business of manufacturing rope and other materials from hemp, sisal, etc. For several years prior thereto he had operated a similar enterprise in Canada and

had acquired an expert knowledge not only of the operation of such a plant, but also of the price of raw materials used. Defendant was president of the corporation so organized and Frank C. Langdon its secretary from the beginning, except for a short time when defendant acted as vice-president. Defendant purchased or supervised the purchase of hemp from importers of such commodity from the beginning until the fall of 1928. From then on Langdon gave the buying orders, but defendant would tell him what to buy. When this change occurred the orders were placed through Clifford L. Ach, who was induced by Langdon to act as a broker for the company and who by arrangement with Langdon added one cent per pound to the price he paid the importers, for which price, plus his commission of two and one-half per cent, he billed the cordage company. The company paid or charged such bills, and Ach, after deducting his commission, would pay the overcharge of one cent per pound to Langdon or his wife. The sum of $18,212.10 was thus obtained, and the evidence shows that practically all of it was turned over to defendant by the Langdons. When the company was short of money in the early part of 1930, the amounts of the importers' invoices were paid either to the importers direct or to Mr. Ach, and the latter was still credited with the full amount billed, including the additional one cent.

The jury could infer from the evidence that the arrangement above mentioned was not only known to defendant but was really initiated by him, although Mr. Ach had not talked to him until the plan had been in operation from three to six months, at which time defendant expressed his appreciation of the additional charge of one cent per pound, as it allowed the company to secure more from the finance company when they borrowed with the merchandise and hemp as collateral. The price of hemp varied from four to ten cents per pound, depending upon quality and the market. Defendant had access to the market reports, and testified that in order to operate successfully as president he kept his eye on the cash price of merchandise he was acquiring. It will be seen that the increase of one cent per pound raised the price to the company from ten to twenty-five per cent above the market. Most of the money so

abstracted was loaned back to the company, resulting in a corresponding credit to defendant on the books.

During this time the company was advised by the Milton Daily Company of Chicago that it had some second-hand cordage machinery for sale, and defendant agreed to purchase the same. Two schedules of accounts were sent by defendant to a finance company, with a letter stating that he needed $1265 with which to purchase machinery. With the money thus obtained a cashier's check was procured and sent to the Daily Company and the amount was charged to defendant on the books of the cordage company. Defendant also arranged to purchase some repair parts for $1343.14. The jury might have inferred from the evidence that the price of the machinery was approximately $5,060 and that the balance of $3,795 was sent to the Daily Company in a draft purchased by defendant himself with a company check and charged to the account of defendant built up by loans made to the company of the money which he had taken from it by the added charge on hemp purchases. About one week after the first machinery payment was made defendant reported at a special meeting of the board of directors of the cordage company that he had inspected some cordage machinery that was for sale in the east, and told his plans for financing its purchase. The minutes do not show that he disclosed the agreed price or the fact that one-fourth of it had been paid by him. The invoice for the parts was also paid by a cashier's check bought by defendant with a company check and charged to him in the same account. Apparently the books of the cordage company do not disclose any other than the three payments mentioned to cover the purchase of machinery and parts, and the evidence discloses that the bank account of the Milton Daily Company shows the deposit of such three payments and does not show the deposit of $2,485 which defendant claimed to have paid F. E. Daily in cash in Chicago and some $3,800 he claims to have paid by a draft of which he could find no record, although "I have been trying to find out about that." It appears that F. E. Daily died some time before defendant so testified. That $5,060 was the actual cost of the machinery in question is strongly indicated by two letters written by defendant and introduced in evidence by the prosecution. The first was one sent to the finance company from

which was obtained the first payment of $1265. It is dated April 22, 1930, inclosing schedules of accounts on which such sum was furnished. In it defendant tells the finance company that he wants to get some money to pay on machinery and asks it to have a cashier's check in his favor for $1265 issued and charged to the schedules inclosed; that he had promised to mail the draft for $1265 "today". The second was a letter sent to the Daily Company early in June of 1930, in which he refers to "the twenty-five per cent of the amount of the machinery [sent] last month". The evidence does not disclose any other sum sent to Daily Company up to that time. If $1265 is twenty-five per cent, the full price would appear to be $5,060, and the difference equals the other payment shown of $3,795. On July 18, 1930, after the payments had been made for the machinery and parts, another meeting of the board of directors of the cordage company was held, at which defendant stated that he had arranged for the purchase of said machinery and that he thought it "should be leased or purchased on a monthly basis". After some discussion defendant and the secretary, Langdon, were authorized to contract for the company for the lease or purchase of such equipment.

In July, 1930, defendant met a man by the name of Harold O. Pressman, who had been connected with a finance company for some time, and there was some discussion about financing the purchase of certain machinery. Pressman was "never told the exact amount", but in round numbers he was given the amount of "about $10,000.00". Two or three weeks thereafter he was given a contract to sign. There was no conversation at that time and he did not read it. Defendant and his attorney were present with him, in the attorney's office.

Pressman testified that he had no money to finance it with. He was shown a contract, the last pages of which contained his signature, but he could not identify any part of it except his signature. It is interesting to note that all of the pages except the one containing his signature were water marked "Lawyer's Bond", and that one is on "Graylock Bond" paper. The last page is a carbon copy and the others are all originals; and instead of reciting a consideration for the machinery of "about $10,000.00", it names one of $25,555.35. The machinery described is the same as that

purchased by defendant as aforesaid, with the addition of ten machines for which he negotiated with the Daily Company, but which were not purchased. Such witness, when shown the inventory of the repair parts, stated that he did not know anything about it. Pressman signed the contract on August 4, 1930, as seller, and defendant and Langdon executed it for the corporation. The contract is dated August 4, 1930, and acknowledges receipt of $5,555.55 upon its execution, the balance to be paid in thirty-six monthly installments of $555.55 each, beginning December 31, 1930. A bill of sale appears to have been made by defendant in favor of Pressman of the machinery that was actually purchased and paid for through the Daily Company. Pressman testified that both the contract and bill of sale were left in the attorney's office, and that he "never took them out".

The evidence shows that on August 21, 1930, defendant in his own handwriting drew an order for certain rope to be shipped to Pressman, amounting, after deducting a purported cash discount, to $2,502.71. An invoice covering such fictitious order was then made, and pursuant to defendant's order the account receivable of H. O. Pressman was charged therewith on August 26, 1930. Apparently no rope was shipped to Pressman or anyone else. On August 26th a $5,000 check on the company's bank was executed by defendant and Langdon and credited to the bank account on the books of the company. It was charged to the Pressman account. The check was indorsed with Pressman's name by someone other than Pressman and was deposited in the bank account of the company with $2.71 in cash on September 30, 1930. On the same day defendant instructed the auditor to credit the Pressman account with $5,000 for repair parts and also to credit the latter with $2,502.71 to cover the charge for the fictitious invoice charged therein, and the balance of the deposit of $5,002.71, i. e., $2,500, was credited to defendant's account. December 9, 1930, defendant instructed the auditor to make a check in favor of Pressman for $5,555.55, saying that he wanted to make a down payment on the Pressman contract. This check was charged to the Pressman conditional sales account on December 9th and appears as a credit to the bank on which it was drawn the same day. On December 29th it was redeposited in the bank with a check for $96.62 issued in favor of defendant

and appears as a charge in an account of his as shown later herein, making a total deposit of $5,652.17, which amount was charged to the Pressman account, offsetting the fictitious invoice of the same amount. At the time, the auditor had not seen the contract nor had it been credited to the Pressman conditional sales account, but the amount thereof, $25,555.35, was credited to such account and charged to the account of "new machinery" on December 23, 1930, by order of defendant, at which time, on the latter's written instructions, initialed by Langdon, the auditor charged the Pressman account with the sum of $2,100.35, which the instructions said was a discount allowed by Pressman if he was paid in advance, immediately, twelve monthly installments on the contract of $555.50 each, or $6,666.60. On December 27th a check for $6,666.60 was issued in favor of Pressman and charged on his conditional sales account. This check was returned to the bank as a deposit December 30th, the account of defendant being credited therewith. The auditor was told by defendant that he wanted the difference between the amount of the Pressman contract and the actual amount he had paid for the machinery "to show as a revenue to sales", and defendant made a fictitious order for rope on which another fictitious invoice in the sum of $5,652.17 was charged to the Pressman account receivable on December 12, 1930, and in the same way another fictitious charge of $2,929.66 for rope was made to said account on December 31, 1930. The fictitious sale of rope amounting to $2,929.66, charged in the Pressman account, was balanced by a check for $1602.09 signed by defendant and Langdon and charged to the personal account of defendant, and by a credit memorandum issued on the instruction of defendant in the sum of $1327.57, which was in turn charged to defendant. There is evidence which tends to show that Pressman knew nothing about any of such transactions except the fact that he signed a contract; that he did not indorse any of such checks, that no rope was shipped under said invoices to Pressman or anyone else and that he had no money to finance any contract.

May 26, 1931, a fire occurred in the plant of the company. In September defendant was examined under oath in regard to the loss and stated that the machines "were purchased by us from a private individual" named Pressman, "who in

turn bought these machines and sold them to us". He said he was not sure of the exact place where Pressman bought them, but that some were from the Indiana state prison; that they were bought by the company on a conditional sales contract; that the company owed "about, I think, $10,000.00", and that the whole machinery came to about $22,000.00 or $23,000.00". The balance of the H. O. Pressman conditional sales contract account on December 27, 1930, after the charge of said two large checks, was a credit of $11,232.85. The bookkeeper of the cordage company testified that on December 31, 1931, defendant gave him a memorandum in writing with instructions to enter same on the books of the company, which was done. The memorandum reads as follows:

"Detail of amount of contract.

| | |
|---|---:|
| Amount of contract ................. | $25,555.35 |
| Less allowance for advance payment ...... | 2,100.35 |
| | $23,455.00 |
| Less machinery for delivery to Houston, Texas ............................ | 5,832.35 |
| | $17,622.65 |
| Less Revenue to Sales, Col. Thorn's time spent on purchase .................. | 5,652.17 |
| | $11,970.48 |
| Less additional revenue to sales, Col. Thorn's time spent on supervision and installation ............................... | 1,602.09 |
| | $10,368.39 |

—Actual cost of machinery to company."

The same witness testified that the credit balance of $11,232.85 in the Pressman account "was wiped out by two entries . . . dated December 31, 1931", one being the charge of $5,832.35 for machinery not delivered to Houston, and the other a charge of $5,400.50 which was reflected in a credit of like amount to the account of defendant.

With this general background of facts, which there is ample evidence to support, we shall take up appellant's contentions.

The condition of the corporation's finances seemed to make it necessary to obtain money from finance companies by the use of warehouse receipts covering fibre in storage and sales of accounts receivable due for merchandise sold. The facts hereinbefore stated show the device adopted for raising the price of the fibre from ten to twenty-five per cent, depending on cost, in order to obtain more money on the material stored. In the sale of accounts receivable for such purpose the accounts to be sold were listed on a sheet containing an assignment form printed at the bottom, which would be executed by the cordage company, and invoices covering the accounts listed were attached, as well as a memorandum copy of bill of lading and shipper's receipt issued by the carrier showing that the goods were shipped. Such a schedule of accounts was prepared by the defendant himself on July 17, 1930, and included an account purporting to be that of the Chas. R. McCormick Co., Port Ludlow, amounting to $469.95. The assignment represented that the schedule set forth "undisputed accounts *now owing* and that proper entries have been made on the books disclosing the absolute sale thereof" to the finance company. This account was supported by an invoice of the cordage company purporting to show a sale to said purchaser of forty reels of twine of such value, marked "Shipped to Port Ludlow", and what purported to be a memorandum copy of a bill of lading of the Bayside Steamship Company acknowledging receipt of forty bales of yarn, consigned to Chas. R. McCormick Lbr. Co., Port Ludlow, to be shipped by steamer "San Diego." This particular form of memorandum and receipt does not contain any place for signature of carrier, except at the bottom under a "Release" clause waiving loss or damage in carriage in excess of stated value. This clause was signed in the shipper's blank "L"—for Langdon—and in the blank by the word "Carrier" the name "Lester" appears. These documents were presented to the Commercial Capital Corporation and the agreed amount of money was paid by such finance concern to the cordage company. The president of the finance company testified in effect that this proof was required to show that the goods were out of the possession of the cordage company. Count III charges that defendant forged and uttered such shipper's receipt knowing the same to be forged, and the count sets it out

*in haec verba.* Count V is as to a similar transaction, involving, however, a different schedule, date, invoice, purchaser and shipper's receipt.

Both schedules above mentioned are in the handwriting of defendant, and the invoices and shipping receipts involved are in the handwriting of Langdon. The evidence seems to support the conclusion that it was quite a common occurrence to use such "dummies" in making the schedules so used. The witness Sawyer, bookkeeper of the cordage company, testified that in August of 1930 the defendant asked him for suggestions for the betterment of conditions in the plant, and that in compliance therewith he gave defendant some written suggestions, among which was the following: "Eliminate putting false and consigned accounts on schedule. At least to the extent it has been done in the past. Give the finance companies all that is coming to them." The numbers on the fictitious invoices are the same as those on *bona fide* invoices for merchandise actually shipped to other customers. Langdon, secretary of the company, testified for the defense that he made up the invoices and shippers' receipts involved in counts III and V, and that he had an order for the goods, although they had not been made up. He did not make it clear, however, why the supporting papers carried the statement that the merchandise had already been shipped, as well as the numbers of *bona fide* invoices apparently theretofore shipped, and the books of the cordage company did not show any such order, sale or shipment. In addition to that already mentioned, there is evidence from which the jury might have concluded that Langdon did nothing but the ordinary detail of his work without consulting defendant, or without being directed by him so to do, and that the finance company would not have purchased the account if it had not believed from the proof given that it was a *bona fide* transaction, notwithstanding the testimony of Langdon that the president thereof said it would be all right to put in anything if the real invoices covered the amount advanced or were as much as seventy per cent of the amount of the schedule.

Appellant urges that the instruments set forth do not show that they have any legal effect and, not constituting a bill of lading and the information not setting forth

facts showing how the finance company could have been damaged, that demurrers interposed by him should have been sustained.

The instruments are not bills of lading, and from the testimony of Langdon it appears that they were like the memoranda which the carrier furnished the shipper, and they apparently served the purpose for which they were intended by defendant, in increasing the amount he could get from the finance company when he did not have *bona fide* accounts to sell. The true test of whether the receipts in question can be the basis of forgery charges is not whether if genuine they would create legal liability, but whether upon their face they will have the effect to defraud those who may act upon them as genuine. (*People* v. *Munroe,* 100 Cal. 664, 667 [35 Pac. 326, 38 Am. St. Rep. 323, 24 L. R. A. 33].) This, we think, they do; and also that the evidence justifies the verdicts thereon.

Do counts VIII to XIII, inclusive, and XV and XVI, each sufficiently state a cause of action?

Count VIII charges that defendant, with intent to defraud the cordage company, the stockholders and creditors thereof, made and concurred in the making of a false entry in the accounts receivable ledger of the company, by causing a credit of $1602.09 to be made in the account receivable under the name of H. O. Pressman. As we have already seen, this account was started by charging fictitious invoices of merchandise therein. Pressman knew nothing about the account, bought no rope and none was manufactured for or shipped to him. These charges were reflected in a credit to the account of "Sales". On December 31, 1930, there was still a charge balance under the name of Pressman of $2,929.66. On January 26, 1931, defendant and Langdon signed a check on the company's bank account in the sum of $1602.09, which the former had instructed the bookkeeper to issue. After indorsing such check defendant told the bookkeeper to deposit it in the bank and show it in the cash receipts record, and to credit it to the Pressman account receivable. This check was charged to the defendant's account in which the fictitious Pressman check was credited on its redeposit, and which gave defendant a fictitious credit in the same sum. Counts IX and X charge as false entries the recording of the checks for $5,555.55 and $6,666.60,

respectively, which were charged to the Pressman conditional sales account as hereinbefore shown. Count XI charges the recording of the sum of $25,555.35 in the journal of the company as a charge to the "New Machinery Account" and as a credit to said Pressman conditional sales account. Count XII charges the entry of said sum in the general ledger of the company. Count XIII charges as a false entry that of the credit to the Pressman conditional sales account of the sum of $2,100.35; count XV the false entry of $5,400.50 as a charge in the Pressman conditional sales account and a credit to defendant, and count XVI the entry of the sum of $5,832.35 as a charge in said Pressman account and as a credit to the machinery account.

▪ It is urged that said counts should show in what manner the entries are false or fraudulent, particularly as all save two are credits to the company, and to show how any of them could defraud the company or its stockholders, and that the demurrer should have been sustained.

Section 563 of the Penal Code so far as material here reads: "Every . . . officer . . . of a corporation . . . who, with intent to defraud, . . . makes, or concurs in making, any false entries . . . in any book of accounts . . . is punishable," etc. Each count shows that appellant was an officer of the corporation, viz., its president and general manager, and alleges that with intent to defraud the company, its stockholders and creditors he did "make and concur in making, a false entry in the journal ledger, said journal ledger being then and there a book of accounts of the said California Thorn Cordage Company, a corporation, said entry being as follows, to-wit". Then follows a description of the entry claimed to be false, followed by the allegation that said books were then and there the books of and in the possession of said corporation, and under the direction and control of defendant, and that "he, the said John C. Thorn, then and there well knew said entry so made, as aforesaid, to be false and untrue".

In our opinion each count states the acts constituting the offense in ordinary and concise language, and in such manner as to enable a person of ordinary understanding to know what is intended. (Sec. 950, Pen. Code.) And specifying, as each count does, the particular entry of which complaint is made, we think they are good as against the

demurrer. (*People* v. *Palmer*, 53 Cal. 615.) ▉ It is not necessary to set out how such entries could have resulted in defrauding the corporation or its stockholders, as that is a matter to be shown by the evidence. (*People* v. *Leonard*, 103 Cal. 200 [37 Pac. 222]; *People* v. *Ah Woo*, 28 Cal. 206, 211.) Does the evidence tend to show such result? In our opinion it does.

It will be seen that the entries charged as false involve in the main five accounts, i. e., the Pressman contract account, the Pressman account receivable, the new machinery account, the sales account and an account of defendant which opens with the above-mentioned charge of $96.62, which with the charge of $1602.09 hereinbefore mentioned, the credit caused by the redeposit of said check for $6,666.60 and the credit balance of $5,400.50 in the Pressman contract account made a credit balance in favor of defendant of $10,368.39, which by a striking coincidence is the same as the amount shown as the "actual cost of machinery" on such Pressman contract account as the same was shown by the entries made therein December 31, 1931. Of course, the bank account through which the issued and redeposited checks passed, balancing each other, is incidentally involved.

▉ The evidence tends to show that both of the Pressman accounts have no foundation in actual transactions and that the new machinery account was fictitiously increased from the real cost of $5,060 to $25,555.35, which amount was later reduced to $10,368.39 (still an increase of more than one hundred per cent) by other entries of similar nature. The net result of such entries was to increase the showing of the sales account, increase the cost of the new machinery to the company and increase the credit balance in favor of appellant very substantially. In view of that we cannot say that the implied finding of the jury as to the falseness of such entries and the fraudulent intent with which they were made does not have substantial support in the evidence; and in our opinion such support is strengthened rather than weakened by a defense exhibit introduced, marked "X3".

We have shown how the Pressman conditional sales account was made to show that the actual cost of the machinery mentioned was $10,368.39. By a strange coincident that seems to be the credit balance in the account on the books in appellant's name, after transferring the credit

balance of $5,400.50 to it from the Pressman contract account. We have also referred to appellant's letter to the Daily Company referring to the payment of one-fourth of the price of the machinery. The exhibit above mentioned is dated at "Chicago, LaSalle Hotel, April 8, 1930", and purports to be a receipt for the sum of $2,485, as follows: "1.04 for telegraphic expense", balance to apply as follows: "$1,327.10 on machinery as per list balance to be paid as follows: $1,265.00 to make 25% of payment of $10,368.39 on or before April 20th, 1930, balance as soon as shipment ready. $1,156.86" on repair parts, "as per list to be furnished, total purchase price $2,500.00, balance $1,343.14 to be paid as soon as shipment is ready". There is a signature purporting to be that of "F. E. Daily" to such paper. It is to be noted that such exhibit tends to show not only that the $2,485 payment in cash was made, as claimed by defendant, but also indicates that part of it, applied to the only first payment shown by the evidence of $1265, makes one-fourth of the total which corresponds to the corrected balance of cost of machinery, and that the balance, after deducting the $1.04, added to the only payment the evidence shows was made on the parts, viz., $1343.14, makes the total price of such parts $2,500, which is the amount to which the first charge of $5,000 therefor was reduced—apparently about the time the change was made in the price of the machinery and after the fire had occurred and defendant had been examined. It also supports the credit balance of $10,368.39 referred to. The $2,500, new cost of parts, had been transferred to the credit of defendant's "deferred liability account". Thorn testified that he found such exhibit in his desk at the factory ten days after the trial commenced. There is evidence showing that several persons had searched the same desk at different times theretofore but that there was no such document there. A handwriting expert testified that the signature was traced from the genuine signature of F. E. Daily, and in view of the fact that the Daily bank account did not show any such deposit or any deposit comparable in amount, with the exception of the deposits of $1265, $3,795 and $1343.14, accounted for, the jury evidently drew the conclusion that such receipt was a forgery. The jurors then could easily have inferred from the evidence that no such payment in cash was made, and that the

receipt was made by defendant to furnish proof to support the statement the books were made to show by other fictitious entries as the "actual cost" of such machinery and parts and to harmonize the cash payments actually made with his story of such cost.

Count XVII charges that defendant on or about the third day of August, 1931, did "willfully, unlawfully, knowingly, fraudulently and feloniously present and cause to be presented a false and fraudulent claim for insurance to the Sussex Fire Insurance Company of Newark, New Jersey, in the sum of thirty-eight thousand four hundred and eight dollers", upon a policy of insurance for the payment of loss by fire "issued to said defendant John C. Thorn and the California Thorn Cordage Company, a corporation", by said insurance company, "and then and there existing and in force". Count XVIII is identically the same, except the amount of the claim is stated to be $53,081.55 and it covers loss to machinery and equipment. Appellant urges that such counts do not state sufficient facts to constitute a public offense, in that they do not state how or in what manner or particular either of the alleged false claims is false or fraudulent, and do not set forth the claims or describe them with reasonable certainty.

In the case of *People* v. *Lauman*, 187 Cal. 214 [201 Pac. 459], the demurrer to the indictment was not only general, but also because it did not conform substantially to the provisions of sections 950, 951 and 952 of the Penal Code, as here, and it was there urged, as here, that the indictment was fatally defective in alleging merely that defendant presented "a false and fraudulent claim of loss by fire". In that case the proofs of loss alleged to have been presented were set out verbatim. Such is not true of the claims charged to have been presented here. That, however, was a matter going to the description of the alleged false document and did not aid the allegation to which objection was made. The court said of such allegation, at page 218: "It is incomprehensible to us how a person of common understanding could fail to be informed by the indictment that respondent [defendant] was charged with anything different than presenting to the Springfield company a false claim of loss suffered by fire"; and also (p. 222) that "it must be held that the indictment substantially alleged facts sufficient

to constitute a public offense under section 549 of the Penal Code and that respondent was not prejudiced by the defects of pleading complained of''. There was no allegation in the indictment there that the companies whose existence ' was alleged issued the policies, nor that the proofs of loss were presented on contracts of insurance for the payment of a loss; and such seem to be the defects held not prejudicial in the last language quoted. Both counts involved here alleged such presentation and the further fact that the claim was ''upon a contract and policy of insurance and indemnity for the payment of loss by fire issued to said defendant John C. Thorn and the California Thorn Cordage Company, a corporation, by said Sussex Fire Insurance Company''. While the claim of loss presented is not set out verbatim, it does give the date of presentation, the amount of the claim, and the name of the company issuing the policy or contract of insurance; and while it does not expressly allege that the fire occurred, damaging property covered by the policy, or describe the policy, we fail to see how anyone could fail to know that it charged the presentation of a claim for loss and damage done by fire to property covered by a policy of insurance issued by the Sussex Fire Insurance Company, and that it was a claim against such company under such policy for such loss. In our opinion, under the authority cited, there was no error in overruling the demurrer on both grounds.

■ Appellant does not seriously urge that there is not sufficient evidence that the claims alleged were false, but he does urge that the evidence does not show the presentation of a claim for $38,408, as alleged in count XVII, and that the evidence shows that the claims were not presented in Los Angeles County.

The evidence shows that the claims under count XVII involved loss and damage by the fire heretofore referred to, to hemp and manufactured merchandise, both of which involved purchases made through the witness Ach and billed to the company at an increased cost of one cent per pound. Certain proofs of loss to such hemp, etc., were filed by the company, proving a loss which aggregated $37,677.61. Appellant urges a variance. We fail to see how he could claim prejudice when the evidence shows, as it does, the presentation of a claim for loss in the exact amount alleged, be-

cause plaintiff did not include in the information, in lieu of the claim charged, four other claims, attached to four proofs of loss, and compel him to defend four charges instead. Nor in our opinion was he prejudiced because in count XVIII plaintiff relies on the claim for loss and damage to machinery and equipment that appears in the proof of loss supporting such claim, rather than on a similar claim that appears to have been sent with that relied on in count XVII.

Section 549 of the Penal Code, upon which the two counts under discussion here were based, reads so far as material as follows: "Every person who presents *or causes to be presented* any *false or fraudulent claim*, or any *proof in support of such claim*, upon any contract or policy of insurance or indemnity whatsoever for the payment of any loss, is punishable," etc. (Italics ours.) It is to be noted that the offense may be either by presenting a false claim or proof in support thereof.

 Appellant urges that the claims for loss and damage were *presented* in San Francisco and not in Los Angeles. That they were sent by registered mail from Los Angeles to the company's office in San Francisco is not questioned. Section 781 of the Penal Code provides: "When a public offense is committed in part in one county and in part in another, or the acts or effects thereof constituting or requisite to the consummation of the offense occur in two or more counties, the jurisdiction is in either." The claim as well as the proofs of loss were prepared in Los Angeles for the sole purpose of presentation to the insurance company; they were deposited in the mail in that county addressed to the office of the company in San Francisco. Those acts were a part of the process of presentation. The consummation of the act may have occurred when the claim was delivered at the office of the insurance company in San Francisco, but its inception was in Los Angeles; and in our opinion it cannot be said that the acts occurring in Los Angeles County, or the effect of such acts, did not form a very effective and substantial part of the completion or consummation of the offense charged. The venue, therefore, could have been laid in either county.

Nor in our opinion is there any material variance shown from the fact that the claim for loss to cordage material is shown to have been based on four policies instead of one, or that any loss on such policies.is payable to California Thorn Cordage Company and Commercial Capital Corporation instead of to John C. Thorn and California Thorn Cordage Company, as alleged. The gist of the offense charged is *the presentation* of the *false claim.* · To be sure, there has to be a contract or contracts of insurance upon which the claim is based to complete the offense, and the information so alleges. The material fact to be alleged and proved to complete the offense is that the party making and presenting, or on whose behalf the claim was made and presented, was protected by the policy. The evidence shows that as to the California Thorn Cordage Company, and it also shows that appellant was the owner of all of the common stock of such corporation as well as some of the preferred. That the information alleged that defendant was also protected and the evidence shows that the Commercial Capital Company was named in the policies instead of defendant is in our opinion immaterial and does not constitute a prejudicial variance, as long as the cordage company, on whose behalf the claim was made, is alleged and proved to be covered by them. A far different situation would exist if the policies themselves were the instruments charged· to have been falsified, assuming that such an offense was named in section 549 of the Penal Code. (*People* v. *Reed,* 70 Cal. 529 [11 Pac. 676]; *People* v. *Cummings,* 117 Cal. 497 [49 Pac. 576].) Unlike such cases, however, where the variance occurred between the allegation and proof of the instrument directly involved, the variance here is in the allegation and proof as to an instrument indirectly involved, and in a particular which is but a part of the description thereof, rather than an essential part of the description of the offense itself. "In determining whether a variance is material, the question to be decided· is, does the indictment so far fully and correctly inform the defendant of the criminal act with which he is charged that, taking into consideration the proof which is introduced against him, he is not misled in making his defense, or placed in danger of being twice put in jeopardy for the same of-

fense." (Underhill on Criminal Evidence, 3d ed., sec. 80.) Applying such test to the allegations and proof involved here, we conclude that appellant could not possibly have been misled in making his defense and that there is no possible danger of his being twice put in jeopardy on a charge of falsifying the claim alleged.

In our opinion the same reasoning applies to the fact that the loss on the cordage materials had to be apportioned to three different policies. The evidence shows that the cordage company had three policies of insurance covering its merchandise and stock in trade, one for $25,000, one for $20,000 and a third for approximately $15,000. The claim of loss alleged sets forth the total loss claimed on such property. Notwithstanding the fact that more insurance was outstanding in the three policies than the amount of loss claimed, and that the loss claimed was in excess of any one policy, it would still be a claim upon a contract and policy of insurance, as alleged, and that is all that is required to complete the offense if the claim is in fact false, as the jury impliedly found.

Because of the above conclusions we see no error in the denial of defendant's motion to dismiss as to counts XVII and XVIII, nor in the refusal to instruct the jury to return a verdict for him as to count XVII. The same is true as to defendant's motion to dismiss as to counts III and X.

It is urged that there is a misjoinder of offenses in the information and that the court erred in overruling appellant's demurrer and objections to such information on that ground, as well as in refusing to grant his motion for separate trials as to each group of offenses charged. If the offenses charged were properly joined it was discretionary with the trial judge, "in the interest of justice", to order them tried separately. (Sec. 954, Pen. Code.) Assuming that they were properly joined, we see no abuse of discretion in denying such motion. Were the counts properly joined?

As we have seen, the three groups of crimes joined are forgery, fraud in keeping accounts in corporate books, and presenting false claims of insurance. The legislature, it seems to us, meant by the use of the words, "the same class of crimes or offenses", in such section, offenses possessing

common characteristics or attributes, and it would seem that the different offenses set out in the information here do have many attributes in common. Fraud is involved in them all, and the purpose of each is to obtain property or credit by false writings. The inference drawn by the jury was that they were so used. The offenses charged were closely related in the plan and scheme of their commission, and the joinder saved useless repetition of evidence, time and expense, both to the state and to the defendant. We think the different offenses were properly joined.

 We know of no statutory authority for a bill of particulars in a criminal case, and under our system of pleading in such cases there seems to be no place for it. No error, then, was committed in denying a motion therefor.

 For reasons hereinbefore mentioned we see no error in admitting the evidence as to the agreement made between Langdon and the witness Ach as to raising the invoice price of fibre billed the company one cent per pound, in admitting evidence as to the purchase of the machinery and parts by defendant and the method of increasing the cost thereof to the company, nor in overruling the objection of defendant to the introduction of evidence of the false entries as to rope invoiced to H. O. Pressman. All of such transactions were so closely related that the jury might well have inferred that they were all pursuant to a common plan and design that had for its purpose the benefit of appellant and the defrauding of the party alleged. Even though not alleged as separate offenses, the proof of them, as similar offenses, threw light on the intent with which the similar acts charged were committed.

 We think the court properly refused, in view of the evidence, to instruct the jury as a matter of law that the bookkeeper Sawyer and the broker Ach were accomplices, and properly left such question to the jury to determine as one of fact.

Objections are urged by appellant to the giving of many instructions as well as the refusal to give many requested by him. We have examined the instructions given as well as those refused, and in our opinion no error appears.

The judgment and order are affirmed.

Stephens, P. J., and Desmond, J., concurred.

A petition by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on June 25, 1934.