[Crim. No. 16380. Second Dist., Div. Two. Feb. 4, 1971.]

THE PEOPLE, Plaintiff and Respondent, v.
GEORGE D. WATSON, Defendant and Appellant.

COUNSEL

Morris Lavine and Welburn Mayock for Defendant and Appellant.

Thomas C. Lynch and Evelle J. Younger, Attorneys General, William E. James, Assistant Attorney General, and James H. Kline, Deputy Attorney General, for Plaintiff and Respondent.

OPINION

**FLEMING, J.**—George D. Watson was indicted on two charges of conflict of interest (Gov. Code, §§ 1090, 1097), and one charge of bribery (Pen. Code, § 68). One conflict-of-interest charge was set aside before trial (Pen. Code, § 995), and a jury convicted Watson on the two other charges. The trial court ordered a new trial on the bribery conviction and then dismissed that charge in furtherance of justice. (Pen. Code, § 1385.) On the conviction for conflict of interest, the trial court fined Watson $1,000 (plus a $250 penalty assessment) and forever barred him from holding office in California. Watson appeals.

Government Code section 1090 prohibits a city officer from being financially interested in any contract made by a board of which he is a member. Watson was a member of the Board of Harbor Commissioners of the City of Los Angeles from 1961 to 1967. His conviction for conflict of interest was based on his vote as commissioner in 1966 to approve a lease of harbor facilities by the City of Los Angeles to an enterprise which he helped finance.

Watson's briefs teem with contentions, but raise only a few basic questions: (1) whether Government Code section 1090 is constitutional; (2) whether the evidence supported the verdict; (3) whether the jury instructions were adequate; (4) whether the trial court's attempts to cope with publicity surrounding the trial prevented a fair trial; (5) whether the conduct of counsel prevented a fair trial; and (6) whether the sentence was constitutional.

1. *Government Code Section 1090*

Government Code section 1090 provides in pertinent part: "Members of the Legislature, state, county, special district, judicial district, and city officers or employees shall not be financially interested in any contract made by them in their official capacity, or by any body or board of which they are members. . . ." Watson contends this section is vague, uncertain, and indefinite, since the word *financially* is nowhere defined.

We disagree. The constitutional mandate of due process of law only requires that the words used in a statute be sufficiently well known to enable persons within its reach to understand and correctly apply them. (*Lorenson v. Superior Court,* 35 Cal.2d 49, 60 [216 P.2d 859].) The word *financially* was added to section 1090 in 1963. Prior to that time this court in *People v. Darby,* 114 Cal.App.2d 412, 427 [250 P.2d 743], found the wording of the section sufficiently definite and certain to enable any reasonably intelligent person to understand the meaning of *interested.* The effect of the addition of the word *financially* to the section has been to make it more precise than was formerly the case. It has now been made explicit that the prohibition in the section against conflict of interest is restricted to financial interest, and the possibility that the section might apply to some other type of interest has been eliminated.[1] Section 1090, therefore, is neither vague nor uncertain, nor indefinite, nor does a prosecution for violation of its terms deny an accused due process of law.

## 2. *Sufficiency of the Evidence*

The basic facts are undisputed. In 1964 Watson, a member of the Los Angeles Board of Harbor Commissioners, visited a floating restaurant in Vancouver, British Columbia, and concluded it would be desirable to have a similar restaurant in Los Angeles Harbor. In late 1964 or early 1965 he persuaded Leonard Udell of Vancouver, owner of an obsolete passenger liner named S.S. Princess Louise, to visit Los Angeles to explore the possibility of bringing the S.S. Princess Louise to Los Angeles Harbor and converting her into a floating restaurant. On that visit Watson introduced Udell to Charles G. Sutton, manager of a Los Angeles Harbor restaurant, and suggested the two of them might put something together. Later Watson went back to Vancouver to look at the S.S. Princess Louise, and Sutton made two trips to Vancouver for the same purpose. On one of these trips Sutton was accompanied by Lawrence Whiteneck, the chief harbor engineer for the Port of Los Angeles.

As early as March 1965 Sutton opened negotiations with the harbor department to obtain a 50-year lease on Berth 237 in Los Angeles Harbor as a location for the S.S. Princess Louise. He also sought to buy a

---

[1]The legislative intent to make the section as precise as possible by adding the word *financially* is apparent from the report entitled "Conflict of Interest" of the Assembly Interim Committee on Government Organization:

"How is the word 'interested' to be interpreted? Presumably this means 'financial interest,' but the language is not explicit. Only contracts and sales are covered by Section 1090, although many other possibilities for conflicts of interest exist. . . . We recommend that Section 1090 of the Government Code be amended to define interest as 'financial interest.' " (California Legislature, 12 Assembly Interim Com. Rep. No. 6 (1961-1963) p. 9.)

liquor license for use on a floating restaurant at that site. On 5 August 1965 Sutton obtained $10,400 from Engineering Associates, an engineering corporation originally owned by Watson but transferred to his wife in 1962 after his appointment to the Board of Harbor Commissioners. The day following Sutton's receipt of this money he put it in an escrow for the purchase of a liquor license for use at Berth 237. In November 1965 Sutton formed the Princess Louise Corporation with himself as president and sole stockholder. He then instructed the escrow company to substitute the name of Princess Louise Corporation for his own as purchaser of the liquor license. In February and March 1966 Princess Louise Corporation made arrangements to acquire other stockholders, buy the S.S. Princess Louise, sell it to the California Small Business Development Company, and lease it back for use as a floating restaurant. Sutton then applied on behalf of Princess Louise Corporation to lease Berth 237 from the City of Los Angeles for occupancy and use by the S.S. Princess Louise as a floating restaurant, and in April 1966 the Board of Harbor Commissioners, including Watson, twice voted in favor of granting the lease. On the day after the second vote the lease was approved by the Los Angeles City Council, and on 10 June 1966 a 25-year lease of Berth 237 to Princess Louise Corporation was executed by the Board of Harbor Commissioners on behalf of the City of Los Angeles. Thereafter, the harbor department spent substantial sums of money to improve Berth 237, and in September 1966 the Princess Louise Corporation opened its bar and restaurant for business. On 30 November 1966 Princess Louise Corporation issued to Charles G. Sutton as payee two checks totalling $10,400, drawn against moneys derived from the operation of the bar and restaurant, and with these checks Sutton purchased a cashier's check for $10,400 payable to Engineering Associates. He then delivered the cashier's check to Watson, who endorsed it "Engineering Associates by G. D. Watson."

The main issue in the case involves the interpretation of these facts. Watson contends the evidence shows only that Sutton owed $10,400 to Engineering Associates at the time Watson voted in favor of the lease, and he argues that the existence of a debt from Sutton to Engineering Associates did not make him financially interested in the lease of Berth 237 to Princess Louise Corporation. ▆ With this argument in mind we have examined the record to see whether it contains substantial evidence to support the jury's conclusion that Watson was financially interested in the lease, for if it does, the verdict cannot be set aside on the ground of insufficiency of evidence. (*People* v. *Newland,* 15 Cal.2d 678, 681 [104 P.2d 778].) ▆ We conclude that the evidence is sufficient to support a finding that Watson was in fact financially interested in Princess Louise Corporation at the time he voted in favor of the lease.

Watson's own testimony showed he wrote checks on Engineering Associates' account and considered it to be his corporation. In his initial appearance as a witness he testified on direct examination:

"Q. Mr. Watson, your business or occupation, sir?

A. Business owner.

Q. And the name of the business?

A. Engineering Associates.

Q. And how long—that is a wholly owned corporation; is that correct, sir?

A. Yes.

Q. And it is owned by whom, sir?

A. By my wife and myself.

Q. And how long have you had Engineering Associates, sir?

A. Well, actually, Engineering Associates since 1954. There was another engineering company with another name that was merged into this.

Q. And you have owned the corporation at least since 1954; is that correct?

A. This is correct."

Sutton testified Watson arranged for his loan from Engineering Associates, and Watson himself testified, "I loaned him this money." Sutton told Watson he was buying the liquor license for use on the Princess Louise. Testimony of various city employees suggested that Watson had been instrumental in expediting approval of the lease and had intervened in its favor on two occasions.

It is also clear that Princess Louise Corporation was created by Sutton as a vehicle to enable him to operate the S.S. Princess Louise as a floating restaurant at Berth 237. In connection with his promotion of this venture Sutton secured a certificate on 30 July 1965 from Bernard J. Caughlin, General Manager of the Port of Los Angeles, which declared:

"To Whom It May Concern:

"This is to advise that negotiations are being carried on with Mr. Charles G. Sutton for a 50-year lease at Berth 237, Los Angeles Harbor, for the location of the vessel PRINCESS LOUISE, which vessel is to be used as a floating restaurant and cocktail bar, with banquet facilities."

The escrow for the acquisition of the liquor license was in Sutton's name, Sutton paid the money into the escrow, and only later did he substitute Princess Louise Corporation as the buyer of the liquor license.

We must disregard the technical relationship of the parties and look behind the veil which enshrouds their activities in order to discern the vital facts. (*People* v. *Deysher,* 2 Cal.2d 141, 146 [40 P.2d 259].) However devious and winding the trail may be which connects the officer with the forbidden contract, if it can be followed and the connection made, a conflict of interest is established. (*People* v. *Darby,* 114 Cal.App.2d 412, 429 [250 P.2d 743].) Here the connection is tangible and explicit, and the jury could have concluded that Watson possessed a creditor-debtor relationship with the Princess Louise Corporation when he voted to approve the lease. A creditor-debtor relationship constitutes a prohibited financial interest under section 1090. Directly in point is the case of *Moody* v. *Shuffleton,* 203 Cal. 100 [262 P. 1095], which held that a conflict of interest existed when a county supervisor approved county contracts made with a business entity whose promissory note and chattel mortgage the supervisor held. In *Moody* the court concluded that the security of the promissory note had been enhanced by the execution of the contracts with the county. So here, the execution of the lease on Berth 237 enhanced the security of the loan to purchase the liquor license and facilitated its prompt repayment.

We conclude that the evidence of financial interest was sufficient to support the verdict.

### 3. *Instructions to the Jury*

The trial court instructed the jury in part: "The word 'financially interested' as used in Government Code section 1090 means any financial interest which might interfere with a city officer's unqualified devotion to his public duty. The interest may be direct or indirect and includes any monetary or proprietary benefits, or gain of any sort, or the contingent possibility of monetary or proprietary benefits. The interest is direct when the city officer, in his official capacity, does business with himself in his private capacity. The interest is indirect when the city officer, or the board of which he is a member, enters into a contract in his or its official capacity with an individual or business firm, which individual or business firm, by reason of the city officer's relationship to the individual or business firm at the time the contract is entered into, is in a position to render actual or potential pecuniary benefits directly or indirectly to the city officer based on the contract the individual business firm has received."

This instruction was directly taken from instructions approved by this court in *People* v. *Darby,* 114 Cal.App.2d 412 [250 P.2d 743] (Instruction

A at p. 433). ■ Watson contends the trial court should have given two "clarifying" instructions also given in *Darby* (Instructions B and C at p. 433), instructions which emphasized that "the disabling interest must be more than a remote, doubtful, speculative, possible, contingent or mental interest, and that in order to convict the accused, it must be found that he stood to gain or lose something." (P. 435.) However, the opinion in *Darby* made clear that Instruction A was a complete and correct statement of the law. The court observed that "[i]t is more than possible that an interest may be contingent or remote and yet influence the member's judgment or vote," and it concluded that the trial court was "generous" to defendant in giving Instructions B and C. (114 Cal.App.2d at p. 435.) Since the "clarifying" instructions in *Darby* set forth a more limited definition of conflict of interest than that specified in the statute, it was not erroneous for the trial court at bench to give only the first instruction.

Watson next contends the following two instructions were only partially correct: "[I]n a prosecution for conflict of interest, the People do not have to prove fraud, dishonesty, or loss; nor is it a defense in such a prosecution that there was no actual fraud and/or dishonesty or loss."

"In a prosecution for conflict of interest, the People do not have to prove that the contract is unfair, unjust or inequitable to the city; nor is it a defense in such a prosecution that the contract was fair, just and equitable." Watson argues the jury should have been allowed to consider whether he was acting in good faith and whether the lease was fair, just, and equitable.

The law is otherwise. The conflict-of-interest statute is founded on the ancient and self-evident principle that no man can faithfully serve two masters, a principle which has always been an essential attribute of every rational system of positive law. (*Stockton Plumbing & Supply Co.* v. *Wheeler*, 68 Cal.App. 592, 601 [229 P. 1020].) The purpose of the statute is comparable to that of the federal conflict-of-interest statute, which has been described by the United States Supreme Court in the following terms: "The statute is thus directed not only at dishonor, but also at conduct that tempts dishonor. This broad proscription embodies a recognition of the fact that an impairment of impartial judgment can occur in even the most well-meaning men when their personal economic interests are affected by the business they transact on behalf of the Government. To this extent, therefore, the statute is more concerned with what might have happened in a given situation than with what actually happened. It attempts to prevent honest government agents from succumbing to temptation by making it illegal for them to enter into relationships which are fraught with temptation." (*United States* v. *Mississippi Valley Co.*, 364 U.S. 520, 549-550 [5 L.Ed.2d 268, 288, 81 S.Ct. 294].) In the same tenor are the observa-

tions of the California Supreme Court in *Stigall* v. *City of Taft,* 58 Cal.2d 565, 569 [25 Cal.Rptr. 441, 375 P.2d 289]: "The instant statutes are concerned with any interest, other than perhaps a remote or minimal interest, which would prevent the officials involved from exercising absolute loyalty and undivided allegiance to the best interests of the city. (See *People* v. *Darby,* 114 Cal.App.2d 412, 426 [250 P.2d 743]; 15 Ops. Atty.Gen. 123, 128.) Conceding that no fraud or dishonesty is apparent in the instant case, the object of the enactments is to remove or limit the *possibility* of any personal influence, either directly or indirectly which might bear on an official's decision, as well as to void contracts which are actually obtained through fraud or dishonest conduct. (*Terry* v. *Bender, supra,* 143 Cal.App.2d 198 [300 P.2d 119].)"

This court in *People* v. *Darby,* 114 Cal.App.2d 412 [250 P.2d 743], succinctly summarized the law on the question of intent: "Appellant attacks sections 1090 and 1097 as invalid in that they do not require a specific criminal intent. The absence of such requirement does not apply to crimes based on public policy. To save the state from certain acts universally deemed to be inimical to the public welfare, it is sufficient if the act is forbidden and a penalty is prescribed for its violation. The intent is imputed." (P. 427.) And in applying the principle to the facts before it the court observed: ". . . the evidence adopted by the jury was sufficient to convince them that appellant had such an interest in the . . . contract as would tend to prevent his exercise of a jealous concern for the best interests of the school district." (P. 429.)

Considerations of fraud and unfairness were therefore irrelevant (*Millbrae Assn. for Residential Survival* v. *City of Millbrae,* 262 Cal.App.2d 222, 238 [69 Cal.Rptr. 251]), and the instructions on this subject were proper and complete.

■ Finally, Watson contends the trial court should have instructed the jury on what constitutes a creditor-debtor relationship, since the prosecution relied on the existence of that relationship to establish Watson's financial interest in the lease. But Watson failed to request such an instruction, and in a criminal case the court is only required to instruct on its own motion on general principles of law. Unless specifically requested, the court need not consider instructions on special points of law or special theories which might apply to particular facts. (*People* v. *Warren,* 16 Cal. 2d 103, 116-117 [104 P.2d 1024]; Witkin, Cal. Criminal Procedure (1963) § 472.) Here, the existence of a creditor-debtor relationship was not challenged, and absent any tender of that issue the court was not required to define the relationship for the jury.

## 4. *Publicity*

In 1967 reporters for the Los Angeles Times, the newspaper of largest general circulation in the area, uncovered evidence which purportedly indicated corruption within the Harbor Department of the City of Los Angeles. Thereafter the Times gave continuous and heavy coverage to its discoveries and to the subsequent indictments and trials of persons connected with or doing business with the harbor department. This publicity focused most intensely on a businessman named Keith Smith, who, assertedly, had attempted to bribe several harbor commissioners. In December 1967, Keith Smith, and harbor commissioners Watson, Rundberg, and Starr were indicted by the grand jury at the same time.

### a. *Gag Order*

In Watson's cause the trial court on its own motion ordered the parties, attorneys, and witnesses to refrain from releasing extrajudicial statements relating to the cause except for basic facts about the identity of the defendant, the nature of the charges against him, and defendant's denial of the charges.[2] Watson did not object to the order at the time it was issued, nor did he object to it prior to entry of judgment by the trial court.

On appeal, Watson urges the invalidity of the gag order because it was entered without prior notice to him and because it unconstitutionally restricted his freedom of speech. He argues that this restriction prejudiced his cause because of the following: the Los Angeles Times was the prime mover in initiating charges against him, and it played a role in his prose-

---

[2]"It appearing to the Court that the within case is one of considerable public interest and may result in substantial publicity, and that there is a reasonable likelihood that dissemination by any means of public communication of extrajudicial statements relating to this case may interfere with a fair trial or otherwise prejudice the due administration of justice, on its own motion the Court makes the following order:

"No party nor attorney herein nor judicial employee nor law enforcement agency or officer associated with this case, nor any agent, employee, independent contractor, business associate or representative of such persons or entities, associated with this case, nor any witness having appeared herein shall release or authorize the release of any extrajudicial statement relating to this case, for dissemination by any means of public communication, excepting substantive matters as follows:

"1. Factual statements of the Defendant's name, age, residence, occupation and family status. 2. The circumstances of arrest, namely, the time and place of arrest, and the identity of the investigating and arresting officers and agencies and the length of the investigation. 3. The nature, substance and text of the charge including a brief description of the offenses charged. 4. Quotes from or reference without comment to public records of the Court in the case, and to other public records and communications heretofore disseminated to the public. 5. The scheduling and result of any stage in the judicial proceedings. 6. A request for assistance in obtaining evidence. 7. A statement without additional comment that the Defendant denies the charges against him. 8. The identities of attorneys herein."

cution equivalent to that of a complaining witness. Its motive in so doing was to discredit the Mayor of Los Angeles and his commissioner appointees in order to defeat the mayor in his forthcoming campaign for re-election. To achieve its objective the newspaper pumped out a running stream of publicity unfavorable to Watson throughout the pendency of his cause, to which because of the gag order Watson was prevented from making any reply. Watson then states: "Thus, while the newspaper repeatedly commented, Watson and his attorney had to remain silent in reply. This was not equal justice under the law nor freedom of speech or press as far as Watson was concerned." He concludes that this one-sided, adverse publicity was bound to have had a prejudicial effect against his case.

Considered as an abstract proposition, Watson's argument under certain circumstances might carry considerable weight. (Cf. *Mills* v. *Alabama,* 384 U.S. 214 [16 L.Ed.2d 484, 86 S.Ct. 1434], where the Supreme Court held that a statutory restriction on the publication of election news on election day, designed to preserve the fairness and impartiality of the election process, was an unconstitutional interference with freedom of the press.) Serious reservations about the fundamental fairness of such an order might arise in instances where a person under indictment was prevented from exercising his freedom of speech in order to reply to public attacks against him by those who had stimulated his prosecution. (Cf. *In re Sawyer,* 360 U.S. 622 [3 L.Ed.2d 1473, 79 S.Ct. 1376], where the Supreme Court set aside disciplinary action imposed on a lawyer who in a public speech during the progress of a trial criticized the fairness and impartiality of the judge before whom the lawyer was appearing as counsel.)

But this is not such a case, and we are not required to consider abstract questions which might arise in some other case but did not arise in this one. Here the gag order was entered by the court in an attempt to insure both parties a fair trial. (Cf. *Sheppard* v. *Maxwell,* 384 U.S. 333 [16 L.Ed.2d 600, 86 S.Ct. 1507]; *Estes* v. *Texas,* 381 U.S. 532 [14 L.Ed.2d 543, 85 S.Ct. 1628].) A comparable order was upheld in *Hamilton* v. *Municipal Court,* 270 Cal.App.2d 797 [76 Cal.Rptr. 168, 33 A.L.R.3d 1029], cert. den. 396 U.S. 985 [24 L.Ed.2d 449, 90 S.Ct. 479], where a writ to prohibit a contempt prosecution for violation of the order was denied. And in *Sheppard* v. *Maxwell,* 384 U.S. 333, 363 [16 L.Ed.2d 600, 620, 86 S.Ct. 1507], the Supreme Court declared that "courts must take such steps by rule and regulation that will protect their processes from prejudicial outside interferences. Neither prosecutors, counsel for defense, the accused, witnesses, court staff nor enforcement officers coming under the jurisdiction of the court should be permitted to frustrate its function."

No objection was made by Watson at the time of the order to lack

of prior notice. Hence lack of notice has been waived. (Witkin, 2 Cal. Procedure, p. 1642.) Nor prior to judgment did defendant object to the order itself or move to vacate or modify its terms. It thus appears that defendant accepted and enjoyed the benefit of the order to the extent it prevented the district attorney and prosecution witnesses from making extrajudicial statements about the cause. Having done this he is not in a position to complain for the first time about the unfairness of the order after it has become history. ▮ We hold that in the absence of timely application by defendant to modify or vacate a presumptively valid order entered for his benefit, and in the absence of any specific showing that prejudice resulted to defendant from a denial of that application, defendant is precluded from challenging the validity of the order on appeal.

### b. *Motion to Sever*

The trial court denied Watson's motion to sever the trial of the bribery charge from the conflict-of-interest charge. Watson claims this ruling was erroneous, because the extensive publicity surrounding the bribery charge, which involved Keith Smith (see *Smith* v. *Superior Court*, 276 Cal.App.2d 145 [80 Cal.Rptr. 693]), so prejudiced the minds of the jurors that it prevented their impartial consideration of the conflict-of-interest charge.

▮ The decision to sever separate offenses for trial rests in the sound discretion of the trial court. (*People* v. *Kelly*, 203 Cal. 128 [263 P. 226].) Here, the trial court was acutely aware of the possible prejudicial effects of publicity. Prospective jurors were asked as a group, and individually, whether they had read or heard of the case in the news media and whether they had formed an opinion about it. Many jurors had not heard of the case at all. Others had heard of the case but could remember no details and had formed no opinions. Only one prospective juror had formed an opinion, and he was excused. Watson challenged none of the prospective jurors for cause and had not exhausted his peremptory challenges when the trial jury was approved and sworn. (Cf. *People* v. *Miller*, 71 Cal.2d 459, 473 [78 Cal.Rptr. 449, 455 P.2d 377].)

Additionally, the record reveals no evidence of confusion of issues or personalities in the minds of the jurors. The conflict-of-interest charge involved a loan, a liquor license, and Charles G. Sutton; the bribery charge involved stock transactions, the development of harbor land, and Keith Smith. The record indicates that the jury reached its verdict on the conflict-of-interest charge first and then continued to deliberate on the bribery charge. Plainly, the conflict-of-interest charge was not riding the coattails of the more publicized bribery charge, and we conclude the trial court did not abuse its discretion in refusing to sever the two charges for trial.

In support of severance Watson also contends that bribery and conflict of interest are totally inconsistent offenses which cannot be joined in the same indictment. We find no merit in this contention. ▇ ▇ Penal Code section 954 permits an accusatory pleading to charge two or more offenses which are connected together in their commission, or are different statements of the same offense, or are different offenses of the same class of crimes. Joinder was proper here because the charges centered upon and grew out of Watson's conduct as a harbor commissioner. Additionally, the offenses of bribery and conflict of interest are closely related to one another, both having been enacted and defined in 1872 as crimes "Against the Executive Power of the State" (Penal Code, part I, title 5, bribery in section 68, and conflict of interest in section 71). Although conflict of interest is now defined in Government Code sections 1090 and 1097 (enacted 1943), the two offenses continue to possess common characteristics and attributes, and remain proper subjects for joinder. (Cf. *People* v. *Thorn*, 138 Cal.App. 714, 734-735 [33 P.2d 5].)

c. *Motion for Mistrial*

Local news media covered Watson's trial with daily accounts of the proceedings, The Los Angeles Times continued its investigation of asserted corruption in the harbor department. ▇ While the trial was in progress the Mayor of Los Angeles, who had appointed the three indicted harbor commissioners, held a press conference at which he declared that Watson's prosecution was unfair and that the district attorney was plotting to "get" the mayor. The mayor's remarks were extensively reported in the news media, and Watson moved for a mistrial, which was denied. Watson argues the trial court should have granted his motion for a mistrial because of the mayor's comments.

We disagree. First, there is no showing how or in what respect the mayor's comments prejudiced Watson's defense. The mayor defended Watson's conduct and criticized the district attorney and the grand jury for prosecuting him. We agree with the observation of the Attorney General that the comments attributed to the mayor favored Watson's cause by characterizing his prosecution as political and the charges against him as highly technical. Second, the trial court repeatedly admonished the jury "not to read, listen to or watch anything about this case that may appear in any of the news media." The jury is presumed to have followed the admonitions of the trial court (*People* v. *Sutic,* 41 Cal.2d 483, 494 [261 P.2d 241]), and there is no evidence that it did not. We find no error in the denial of the motion for a mistrial.

### 5. *Conduct of Counsel*

▉ Watson argues that in presenting his defense he was denied effective assistance of counsel, contending that his attorney should have moved for a change of venue, for a continuance, for sequestration of the jury; that he should have tendered clarifying instructions; and that he should have argued to the jury that the $10,400 loan was made by Engineering Associates to Sutton and did not involve Watson.

To justify relief on the ground of inadequate representation by counsel, an extreme cause must be disclosed. It must appear that counsel's lack of diligence or competence reduced the trial to a "farce or a sham." (*People* v. *Ibarra,* 60 Cal.2d 460, 464 [34 Cal.Rptr. 863, 386 P.2d 487].) We see no indication whatever that Watson's trial can be so characterized. First, it is relevant to note that Watson's attorney was selected by him, not appointed by the court (*In re Rose,* 62 Cal.2d 384, 389 [42 Cal.Rptr. 236, 398 P.2d 428]), and that Watson made no objection during the course of the trial to his counsel's effectiveness. Second, as in *People* v. *Massie,* 66 Cal.2d 899, 911 [59 Cal.Rptr. 733, 428 P.2d 869], Watson's attorney vigorously represented his client, thoroughly cross-examined prosecution witnesses, presented a lengthy defense, urged necessary objections, and acquitted himself well in arguments at bench. As a result of his efforts two of the three charges against Watson were dismissed. The deficiencies Watson now assigns to his attorney involve matters of tactical judgment, which is never perfect, and even hindsight may be endlessly debatable. For example, Watson suggests the incompetency of his trial counsel because the latter did not substitute artifice for candor and contend that Watson and Engineering Associates were strangers to one another. Had such tactics been followed their effect on judge and jury might well have proved disastrous for defendant's credibility. While conceivably under the tactics now proposed by Watson he might have been acquitted of all charges, it is equally conceivable that under those same tactics he might have been adjudged a felon and sentenced to state prison. We find no semblance of that incompetency of counsel which would render the trial a farce or a sham.

▉ Watson also contends the district attorney committed prejudicial misconduct in making comments in his opening statement which he should have known were untrue. The comments were, (1) the evidence would show Sutton was broke at the time he borrowed money from Watson, and (2) the prosecution would call another harbor commissioner to testify that Watson said he had a percentage of the Princess Louise.

We find nothing prejudicial in these comments. On the first point, evidence at the trial supported an inference that Sutton was, in the vernacular, broke. Sutton testified that he had been out of work for a year and that,

although he possessed substantial net worth, his cash position was bad. On the second point, while the district attorney did not call another harbor commissioner to testify what Watson had told him, nothing in the record suggests that at the time of the opening statement the district attorney did not intend to call that witness or knew the latter would not testify. Only moments after the comment the trial court admonished the jury that it was not to consider opening statements of counsel as evidence. And in closing argument the district attorney said it would be unfair for the jury to infer "that Mr. Watson had a piece of that boat."

We conclude that Watson was not denied a fair trial by the conduct of counsel for either defense or prosecution.

## 6. *The Sentence*

Government Code section 1097 provides in pertinent part: "Every officer or person prohibited by the laws of this State from making or being interested in contracts . . . who wilfully violates any of the provisions of such laws, is punishable by a fine of not more than one thousand dollars ($1,000) or by imprisonment in the state prison for not more than five years, and is forever disqualified from holding any office in this State." Under this section the trial court fined Watson $1,000 and forever barred him from holding office in the State of California.

Watson contends the judgment of disqualification from office denied him his constitutional right to due process because he was given no notice and provided with no hearing prior to the entry of the judgment which forever barred him from office. This contention is frivolous. Penal Code section 15 provides that the state may punish by disqualification to hold office; Government Code section 1097 gives notice that disqualification to hold office is a penalty attached to a violation of Government Code section 1090. At the time of sentence Watson was chargeable with knowledge of the penalties provided by law for the offense for which he was prosecuted and convicted. Parenthetically, we note that "forever" need not run in perpetuity, for on rehabilitation Watson can apply to the governor for a pardon. (Cal. Const., art. V, § 8.)

Penal Code section 13520 creates a Peace Officers' Training Fund, and section 13521 provides that penalty assessments for the benefit of the fund shall be levied and collected in specified amounts by the courts. The judgment imposed a penalty assessment on Watson, which amounted to $250. Watson's contention that these sections deny him equal protection of law has no merit. (*People* v. *Norman,* 252 Cal.App.2d 381, 398-399

[60 Cal.Rptr. 609]; *In re Harris,* 69 Cal.2d 486, 488-489, fn. 3 [72 Cal. Rptr. 340, 446 P.2d 148].)

The purported appeals from "orders" and "the order after judgment imposing a fine and penalty assessment" are dismissed. The judgment is affirmed.

Roth, P. J., and Herndon, J., concurred.

A petition for a rehearing was denied March 3, 1971, and appellant's petition for a hearing by the Supreme Court was denied April 1, 1971.