[Crim. No. 27867. Second Dist., Div. Three. Feb. 8, 1977.]

THE PEOPLE, Plaintiff and Respondent, v.
JACK VALLERGA, Defendant and Appellant.

**COUNSEL**

Murphy, Thornton, Hinerfeld & Cahill, Robert E. Hinerfeld, Richard A. Murphy, John D. Cahill and David Elson for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Howard J. Schwab and William R. Pounders, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**FORD, P. J.**—In a trial by jury, defendant Jack Vallerga was found guilty of the following offenses: (1) violation of section 1090 of the Government Code[1] in that on or about April 9, 1973, defendant did "wilfully, unlawfully and feloniously have a financial interest in a contract which contract was made by him in his official capacity as Assessor of Orange County, California" (count I); (2) violation of section 424, subdivision 1, of the Penal Code[2] in that on or about March 12, 1973, defendant who, as Assessor of the County of Orange, was charged with the transfer and disbursement of public moneys, "did unlawfully appropriate such public monies to his own use, to wit: to purchase an airline ticket for his personal use and benefit" (count II); (3) violation of section 424, subdivision 2, of the Penal Code in that on or about March 12, 1973, defendant "did use such public monies for an unlawful purpose, to wit: to purchase an airline ticket for his personal use and

---

[1]Government Code section 1090 provides as follows:

"Members of the Legislature, state, county, district, judicial district, and city officers or employees shall not be financially interested in any contract made by them in their official capacity, or by any body or board of which they are members. Nor shall state, county, district, judicial district, and city officers or employees be purchasers at any sale or vendors at any purchase made by them in their official capacity.

"As used in this article, 'district' means any agency of the state formed pursuant to general law or special act, for the local performance of governmental or proprietary functions within limited boundaries."

[2]Penal Code section 424 provides as follows:

"Each officer of this state, or of any county, city, town, or district of this state, and every other person charged with the receipt, safekeeping, transfer, or disbursement of public moneys, who either:

"1. Without authority of law, appropriates the same, or any portion thereof, to his own use, or to the use of another; or,

"2. Loans the same or any portion thereof; makes any profit out of, or uses the same for any purpose not authorized by law; or,

"3. Knowingly keeps any false account, or makes any false entry or erasure in any account of or relating to the same; or,

"4. Fraudulently alters, falsifies, conceals, destroys, or obliterates any such account; or,

"5. Wilfully refuses or omits to pay over, on demand, any public moneys in his hands, upon the presentation of a draft, order, or warrant drawn upon such moneys by competent authority; or,

"6. Wilfully omits to transfer the same, when such transfer is required by law; or,

"7. Wilfully omits or refuses to pay over to any officer or person authorized by law to receive the same any money received by him under any duty imposed by law so to pay over the same;—

"Is punishable by imprisonment in the state prison for not less than one nor more than 10 years, and is disqualified from holding any office in this state.

"As used in this section, 'public moneys' includes the proceeds derived from the sale of bonds or other evidence of indebtedness authorized by the legislative body of any city, county, district, or public agency."

benefit" (count III); (4) violation of section 424, subdivision 7, of the Penal Code in that on or about April 9, 1973, defendant "did wilfully omit and refuse to pay over to the Treasurer of the County of Orange, California, money received by him under a duty imposed by law to pay over the same, to wit: money received by him as reimbursement for purchase of airline tickets, which airline tickets were purchased by the County of Orange" (count IV); (5) violation of section 424, subdivision 7, of the Penal Code in that on or about June 5, 1973, defendant "did wilfully omit and refuse to pay over to the Treasurer of the County of Orange, money received by him under duty imposed by law to pay over the same, to wit: money received by him for the sale of the Single-family Residential System" (count V); (6) violation of sections 484-487 of the Penal Code, grand theft, in that on and between the 12th day of March 1973, and the 6th day of June 1973, defendant "did unlawfully and fraudulently appropriate to a use and purpose not in the due and lawful execution of his trust, property which he had in his possession and under his control by virtue of his trust and did wilfully and unlawfully secrete said property with a fraudulent intent to appropriate it to such a use and purpose, contrary to Penal Code section 504, said property being of a value exceeding two hundred dollars ($200.00)"; it was also found that "the theft was of public funds" (count VII).

Defendant was found not guilty of a violation of sections 484-487 of the Penal Code as charged in count VI of the indictment.

Defendant's motion for a new trial was denied.

As to counts I, II and VII, the proceedings were suspended without imposition of sentence and defendant was granted probation for a period of five years on certain terms and conditions, one of which was that he spend sixty days in the county jail. As to counts III, IV and V, the proceedings were suspended without imposition of sentence, the imposition of sentence as to such counts to be permanently stayed if the judgment was affirmed. The court further ordered and informed defendant that "he is forever barred from holding a public office in the State of California" and defendant was ordered "removed forthwith from the Office of Assessor for the County of Orange, State of California."

Defendant "appeals his conviction upon Counts I through V and VII of the indictment in this case."[3]

The facts giving rise to defendant's conviction as to the designated counts of the indictment herein are as follows.

In October 1970 Andrew J. Hinshaw, the then Assessor of the County of Orange, proposed to the Orange County Board of Supervisors that that board authorize the sale of the "Single Family Residence Computer Appraisal System" which had been developed by the Orange County Assessor's office. Mr. Hinshaw indicated in a letter to the board of supervisors that his office had "computed the cost of physically reproducing the system" at $2,045. The minutes of the Orange County Board of Supervisors dated November 10, 1970, provided in pertinent part as follows: "On motion . . . duly seconded and unanimously carried, the Assessor is authorized to release the Single Family Computer Appraisal System to any interested party for a fee of $2,045 or individual components thereof, as indicated on the attached schedule, and the revenue derived from such sales is to be placed in the General Fund."

John Q. Ebert was the Assessor for Spartanburg County, South Carolina. Mr. Ebert was interested in putting into effect a computerized appraisal system in Spartanburg County. He understood that Orange County had in effect a successful system of computerized appraisals of residential properties for assessment purposes. He wanted to emulate or duplicate the Orange County system for Spartanburg County.

In early 1973 Mr. Ebert contacted by telephone Andrew J. Hinshaw, the former Assessor for the County of Orange, who was at that time in Washington, D.C., as a member of Congress. Mr. Ebert sought to make sure that the Orange County system's success was not due to the particular type of properties which existed in Orange County, but "was indeed due to the power and capabilities of the system and they would in fact work on our [Spartanburg County's] kinds of properties." Mr. Ebert wanted to implement a plan, with Mr. Hinshaw's help, to collect a sampling of data relative to properties in Spartanburg County to be "tested on the Orange County system." He testified as follows: "If I was convinced by the results with regard to the ability of the system to handle our kinds of property, then I would proceed with the acquisition and

---

[3]We construe defendant's appeal to be from the order granting probation. (Pen. Code, § 1237.)

evaluation and usage of the Orange County system. So at the outset what I was after was a testing of would it work on our properties."

Mr. Ebert was concerned about the "difference in the nature of the housing" between Orange County and Spartanburg County. Large subdivisions were not common in Spartanburg County. He testified: "In our part of the country one builder would build one house and another builder would build one next to it and then there would be some vacant lots and it might be ten years before those are built possibly. Some houses would be very large and elaborate, $200,000 kind of houses and other ones would be more moderate, $20,000 houses right next to each other. This mixture of properties was of concern to me." Mr. Ebert understood "fully"that computerization of appraisals worked well when properties were very similar because that only involved accounting for small differences in properties.

Mr. Ebert further testified that he and Hinshaw agreed "on a way to proceed." First, data was to be collected from a sampling of a cross-section of Spartanburg County properties. Then Mr. Hinshaw and defendant Vallerga would come to Spartanburg and they would accompany Mr. Ebert and his chief appraiser in a review of the various kinds of Spartanburg residential properties, actually visiting the properties to "confirm" the designation made by the Spartanburg Assessor's office of the different property "characteristics."

Mr. Hinshaw "suggested or advised" that defendant Vallerga was "the one most familiar with the details of making things work from the appraiser's standpoint in putting into the computerization" and that Vallerga would be very valuable "to work with us on making sure that our properties were properly described and defined for input." Mr. Hinshaw and defendant arrived in Spartanburg in mid-March of 1973. They visited the Spartanburg Assessor's office and spent many hours visiting the sample Spartanburg properties by car. Mr. Hinshaw and defendant were in Spartanburg for approximately a day and a half.

At the airport, when Mr. Hinshaw and defendant were departing, Mr. Ebert had a discussion with Mr. Hinshaw "relative to fees to be charged either by Mr. Hinshaw or Mr. Vallerga." Mr. Ebert testified that his discussion "was with Mr. Hinshaw essentially," but that Mr. Vallerga was present in the group when the discussion was had with respect to fees. Mr. Ebert testified that he asked Mr. Hinshaw "how much was he going to charge me for the time that he had just spent." Mr. Hinshaw

quoted a fee of $500 per day. Mr. Ebert stated that Mr. Hinshaw's figure "seemed a bit high," and Mr. Hinshaw responded that the figure "included expenses." Mr. Ebert asked Mr. Hinshaw "if he would break down the fee some for time and some for expenses." He further testified as follows: "Then there was some discussion about what would be the fee if I did accept the program, the Orange County system, if I did in fact employ it if I found the results to my satisfaction and I agreed to pay Mr. Hinshaw $6,000 with regard to his services if I proceeded with the acquisition of the Orange County program."

With respect to the sum of $6,000 that was to be paid to Mr. Hinshaw, Mr. Ebert testified that "[t]he six thousand was a figure for services with regard to the acquisition, interpretation or understanding and implementation of the Orange County system in Spartanburg County, assistance to me in making use of what I was going to get in the documentation." During this conversation Mr. Ebert "was advised that the documentation for the Orange County system, the materials could be obtained from Orange County for around $2,000."

Sometime after Mr. Hinshaw and defendant left Spartanburg, Mr. Ebert received individual bills from them covering their services rendered in Spartanburg. Certified copies of Mr. Hinshaw's and defendant's bills were introduced in evidence. Mr. Ebert testified that exhibit 3 was a certified copy of a check of the Spartanburg Board of Control, dated April 5, 1973, in the amount of $714, in payment to defendant of the charges itemized in his bill for services.

After Mr. Hinshaw and defendant left Spartanburg, Mr. Ebert's office had to change the "designation of the data" they had collected with respect to the sampling of Spartanburg properties so that the Spartanburg material would "conform with the information that we had obtained from Mr. Vallerga." Mr. Ebert testified that subsequently they received a "key punch card layout form." They put their data from the sampling of Spartanburg properties "onto a number of key punch cards in the format designated by a card layout and then sent that box of cards to Orange County for input into some test runs, some applications in their computer system."

Dr. Robert Anderson, an employee of Beckman Instruments and a personal friend of Mr. Ebert, served as a consultant to Spartanburg County with respect to that county's search for a computer appraisal system. Dr. Anderson was in Spartanburg at the time that Mr. Hinshaw

and defendant visited that city in mid-March. Dr. Anderson spoke with defendant "relative to the Orange County computerized appraisal system" at that time. A week or two after the meeting in Spartanburg, Dr. Anderson accompanied Mr. Ebert to a meeting which was held in defendant's office in Orange County, attended by Mr. Ebert, Dr. Anderson, defendant and a number of defendant's staff, including Mrs. Kinzer and Mr. Montani. With respect to that meeting Dr. Anderson testified as follows: "By that point in time we had accumulated data on approximately three to four hundred properties, a substantial amount of data that had been carefully checked and confirmed and we had a good part of that with us that we could look at and talk about at that meeting and I believe we discussed the data in some detail and whether or not it could be run using the Orange County program and whether or not that would be a meaningful test and so on and we settled all the technical details of that problem. . . . We established a procedure whereby we would complete accumulating the data on those properties, put the data into a form suitable for coding into the Orange County system and punch the cards for the computer run. Q. What did Mr. Vallerga and the Orange County employees agree to do then as a result of that information that you would furnish them? A. They would go ahead and run it along with one of their normal runs and supply us with the output from the run for us to peruse at some convenient point in time and determine as to whether or not that was an acceptable approach."

With respect to the significance of the test run which was to be made in Orange County, Mr. Ebert testified as follows: "Oh paramount, I needed to have the satisfaction that the Orange County system as it is called could effectively treat the different kinds of properties that we had at Spartanburg County. The elements of those different kinds of properties were contained within those key-punched data cards, those cards with the data that the Orange County programs were applied against. The results of that application, I awaited with anticipation to review and evaluate with the decision to be made of whether or not I was going to purchase the documentation, therefore [sic], the Orange County system and spend the money with regard to the services concerning that. So the cards, the data on those cards, the test that those cards and data were involved in were all very important to me."

Lydia Kinzer, a statistical analyst for the Orange County assessor's office, testified that she "planned the test run," by which she meant that when the assessor's office "received the data" from Spartanburg she "planned what control cards are to be prepared in order to make the

calculation that we desired." Mrs. Kinzer further testified that the Orange County office ran nine problems for Spartanburg on April 5, 1973. One of the problems was rerun on April 17. The data received by Mrs. Kinzer relative to the Spartanburg test run presented a novel problem with regard to the application of the Orange County computer program "[i]n some respects."

Mrs. Kinzer identified exhibits 16 and 17 as documents relating to instructions that she prepared "for control cards," and stated that they were "designed" by her "to be used in connection with the data submitted by Spartanburg, South Carolina." Mrs. Kinzer testified that in preparing exhibits 16 and 17 it was necessary that she "utilize a formula and logic which is part of the Orange County computerized system." Mrs. Kinzer also prepared exhibit 19, which was a set of instructions to the people who ran the computers regarding the test run.

The nine problems run for Spartanburg County and embodied in the printouts (exhibit 15) were not complex problems. They were "[v]ery simple." However, Mrs. Kinzer did not recall that she had ever, in her capacity as an employee of the Santa Ana assessor's office, made a test computer run with respect to property outside the county, as was done with respect to the Spartanburg properties.

Mrs. Irene Beattie, a systems analyst in the Orange County Assessor's office, testified that she had about "a couple hundred cards" key-punched for the test run which the Orange County Assessor's office performed for Spartanburg County. She thereafter prepared a master file of the information on the cards and prepared the "extracts" required by Mrs. Kinzer for her multiple-regression problems.

Dr. Anderson testified that the test run and the printout of the results probably took "something less of half an hour or 20 minutes perhaps" and that the cost of the test run in computer time and paper was "less than $20."

After the test run or demonstration was made by the Orange County assessor's office, Mr. Ebert received the printouts of the test results, which were introduced in evidence as exhibit 15. Mr. Ebert testified that he reached the decision to acquire the Orange County computerized system "after I had gotten the results back from Orange County, the results of the test that we had run, the test upon our some 400 sampler of test properties."

When Mrs. Beattie was notified that Spartanburg County intended "to purchase the system," she provided the "documentation." In addition to the documentation with respect to the Orange County system, Spartanburg County was also supplied with a computer "tape" of the program.

Mr. Ebert testified that at the time defendant left Spartanburg County in mid-March, defendant's consulting services had been completed and his fee therefor had been earned. At no time was Mr. Ebert told that the $6,000 which he authorized to be paid to Mr. Hinshaw was to be shared with defendant.

After the documentation package was received by Spartanburg County, that county largely went its own way in implementing the system, using only a portion of the materials from Orange County.

The check for $6,000 made payable to Mr. Hinshaw was not drawn until the latter part of May 1973. Mr. Ebert had concluded some weeks prior to May 22, 1973, that no further services would be required from Mr. Hinshaw or defendant. However, with respect to Mr. Ebert's conversation with Mr. Hinshaw as it related to the $6,000 consulting fee, it was Mr. Ebert's understanding that Mr. Hinshaw would help him put into effect in Spartanburg County any or all portions of the Orange County program. Mr. Ebert testified that as things worked out he "didn't require much assistance beyond having gotten it all . . . having gotten all the documentation, the assistance that I required subsequently turned out to be rather minimal."

The parties stipulated as to certain matters. It was stipulated that Donald Edward Wilson Storey, the manager of World Travel Bureau, which handled the travel account for the Orange County Assessor's office, would testify that exhibit 26 was a copy of the coupon retained by World Travel Bureau for a round-trip airline ticket to Washington, D.C., and Spartanburg, issued March 12, 1973, for defendant. It was also stipulated that the airline ticket was picked up by Laura Hagen, an employee of the Orange County Assessor's office. It was further stipulated that Michael Raithe, chief of claims and disbursing for the Orange County Auditor-Controller's office during the pertinent time, would testify that Orange County paid the World Travel Bureau invoice covering the airline ticket issued to defendant and that the county was not reimbursed for the cost of the ticket; that Mr. Raithe would also testify that defendant was paid his full salary for the period of March 1, 1973, through June 30, 1973, and that the auditor's records did not reflect that defendant was on

vacation at any time during that period; and that Mr. Raithe would further testify that an elected county official does not earn vacation time.

In his own defense, defendant testified that he assumed the position of Orange County Assessor after Mr. Hinshaw was elected as a congressman from Orange County. Defendant was subsequently elected as assessor in June 1974. He testified that as an elected official of Orange County he was entitled to "no accumulation of vacation or sick leave as such." He was required to accomplish "the task of the office, whether it takes one hour, a week or 50 hours a week."

Defendant testified that Mr. Hinshaw contacted him by telephone regarding Spartanburg County's interest in the Orange County computerized assessment system and said that Spartanburg County would like defendant and Mr. Hinshaw to advise them on "whether it was applicable or not applicable." Mr. Hinshaw indicated that "there probably would be a consulting fee."

Defendant further testified that he and Mr. Hinshaw arrived in Spartanburg, South Carolina, around 9:30 or 10 o'clock on the evening of March 14, 1973. He flew to Spartanburg from Washington, D.C., where he had been "[o]n county business." Mr. Ebert met defendant and Mr. Hinshaw at the airport and took them to the Ramada Inn, where they stayed.

The following morning defendant and Mr. Hinshaw went to the assessor's office, where they were shown around the office and had "general discussion with the staff and Mr. Ebert, what his desires were and what they might be." Defendant spent the afternoon and the next morning inspecting properties. He testified that he had discussions with the staff of the Spartanburg Assessor's office and "they were preparing their data for a possible test run." Defendant gave them a "pretty thorough discussion of the [Orange County] classification systems" at that time.

Defendant testified that Mr. Hinshaw and Mr. Ebert left Spartanburg before he did, and that he did not see Mr. Ebert again "in Spartanburg . . . on that trip." Defendant further testified that the only discussion regarding consulting fees had with Mr. Ebert occurred at the motel on the first night that they were in Spartanburg.

In early June of 1973 defendant received a check from Mr. Hinshaw for $3,000. Prior to that he had received a telephone call from Mr. Hinshaw, during which Mr. Hinshaw stated "that he had received a fee from the—a windfall fee from Spartanburg, South Carolina and he wished to share it with me." Mr. Hinshaw personally delivered the check to defendant and at that time the "gist" of Mr. Hinshaw's conversation was "that he [Hinshaw] had received his bill from Spartanburg and that he wished to share it with me, that as far as computerizing of the programs were certainly a joint effort with many hours devoted in past years' association."

On cross-examination defendant testified that on March 13, 1973, he left the Los Angeles airport and arrived in Washington, D.C., in the late afternoon at approximately 4 or 4:30 o'clock. He went to his hotel and then had dinner with Mr. Hinshaw. The following morning defendant went to Mr. Hinshaw's office and "spent most of the day with Mr. Hinshaw." Exhibit 26 was a copy of the airline ticket for defendant's flight from Washington, D.C., to Spartanburg. Defendant's secretary ordered the ticket for defendant.

The Orange County Assessor's office has two transportation accounts. The "270 account" is for meetings and conferences. The "260 account" is for "general travel for mileage of employees and those expenses dealing with audits." Exhibit 36, the invoice from World Travel Bureau for defendant's airline ticket to Washington, D.C., was billed to the "260 account" and marked as "an out-of-state audit trip." While in Washington, D.C., on March 13 and 14, 1973, defendant did not conduct any audits, nor did he conduct any audits in Spartanburg on March 14, 15 or 16.

Andrew J. Hinshaw testified that he asked defendant to come to Washington, D.C. Mr. Hinshaw further testified that he "was working on legislation and our committee was working on legislation on committees in post offices and civil service that would have a dramatic impact on the Census Bureau in the way it was collecting information and it involved state and local governments and that I would like to talk with him about what his attitude would be as the assessor of Orange County in cooperating with the federal government." Mr. Hinshaw thought it would be "very helpful to me in part and to Mr. Vallerga to have him understand how the committee process from Washington functions." A subcommittee of the Government Activities Committee which dealt with government computers was meeting on March 14, 1973, and the Post

Office Civil Service Committee was having a public hearing that day which Mr. Hinshaw was scheduled to attend.

With respect to conversations with Mr. Ebert concerning Mr. Hinshaw's $6,000 consulting fee, Mr. Hinshaw testified that Mr. Ebert told him that he had a limited budget and that he could pay Mr. Hinshaw $6,000 "if I were to consult with him as to how to implement the program in Spartanburg." That conversation took place at the Spartanburg airport and defendant was not present. No agreement was reached at that time, but in subsequent conversations by telephone "it was kind of firmed up." With respect to the consulting services which he expected to render in exchange for the sum of $6,000, Mr. Hinshaw testified: "To explain the rationale behind the system, to explain the technical details involved in implementing the system, to advise him how to convert their classification system of building construction costs to accommodate the system, to advise them as to the importance of the system to management as well as to the appraisal function, to advise him as to the quickest most reliable way to install the system. Oh, I am sure that there were probably some other things that would be contemplated but I don't recall them offhand."

With respect to the sum of $3,000 paid by Mr. Hinshaw to defendant, Mr. Hinshaw testified that he "just decided that I would give him $3,000." He stated that "[t]here was no understanding in any way, shape, manner, or form that he was in fact to receive any portion of any consulting fee that I received."

### Conflict of Interest Conviction

With respect to defendant's conviction under count I of the indictment, he contends that he did not have any interest in the contract between Orange County and Spartanburg County for the sale of the "Single Family Residence Computer Appraisal System" (hereinafter designated as the SFR package). Thus, defendant states in his opening brief that he was "neither seller nor buyer, either directly or indirectly," and that there was "a total failure of proof that defendant had a 'financial' or any other 'interest' in that contract."

In *People* v. *Darby,* 114 Cal.App.2d 412 [250 P.2d 743], the court analyzed the nature of the prohibited interest under Government Code section 1090, stressing that the determination as to whether such an interest exists in a particular case is primarily a factual one. Thus the

court stated (114 Cal.App.2d at pp. 431-432): "Appellant extends his artful argument to include the contention that an officer to be 'interested' in a contract in the statutory significance of the word must participate in the advantages or detriments resulting from the contract. . . . Whether a trustee holds a prohibitive interest at the time he votes for a contract must be determined from all the facts existing at the time of its adoption. [Citations.] . . . [¶] The statutes are general in prohibiting an officer from being interested in a contract. He must not place himself in a position where his personal interest will conflict with his faithful performance as trustee and, however so fair the contract may appear to be, the trustee will not be suffered to occupy a position so equivocal and so fraught with temptation. [Citation.] Precedent is of little value except as an analogue. Whether an officer or board member was interested at the time he or his board made the contract is a question for determination in each controversy. If the jury were convinced by all the evidence that appellant intentionally created a situation whereby he became interested in the contract to be awarded by the board and that he actively participated in effectuating the contract their verdict cannot be upset."

In *Darby* the court pointed out that the law does not require that the defendant share directly in the profits to be realized from the contract in order to have an "interest" prohibited under Government Code section 1090. The court further stated (114 Cal.App.2d at p. 425): "It does not require the member to acquire a transferable interest in the forbidden contract before he may be amenable to the inhibition of the statute, but if the member is for any reason placed in such position that he prefers the execution of a proposed contract more than he desires the public good to be served, then he is interested. And when the board authorizes the contract, such member violates sections 1090 and 1097. Sound public policy dictates that these officers shall be denied the right to have any personal interest in contracts negotiated by them in their official capacity. Such policy is obviously premised on the ancient truism that one cannot faithfully serve two masters at one and the same time."

The fact that the contract is fair and untainted by fraud is irrelevant with respect to a determination of the existence of an interest forbidden under Government Code section 1090. In *People v. Watson,* 15 Cal.App.3d 28, at page 39 [92 Cal.Rptr. 860], it was stated that " '. . . the object of the enactments is to remove or limit the *possibility* of any personal influence, either directly or indirectly which might bear on an official's decision, as well as to void contracts which are actually obtained through fraud or dishonest conduct.' " (See *Millbrae Assn. for Residential*

*Survival* v. *City of Millbrae,* 262 Cal.App.2d 222, 237-238 [69 Cal.Rptr. 251]; *Terry* v. *Bender,* 143 Cal.App.2d 198, 206-207 [300 P.2d 119].) And as was said by the court in *Schaefer* v. *Berinstein,* 140 Cal.App.2d 278, at page 291 [295 P.2d 113]: "Statutes prohibiting personal interests of public officers in public contracts are strictly enforced. [Citations.]"

In the case presently before this court the evidence was sufficient to support the jury's determination that defendant was financially interested in the contract between Orange County and Spartanburg County for the purchase and sale of the SFR package. The evidence showed that Mr. Ebert's interest in the purchase of the Orange County SFR package was dependent upon the results of a preliminary test run of the sample of Spartanburg properties for the purpose of determining the feasibility of using the Orange County system in Spartanburg County. Mr. Ebert first contacted Mr. Hinshaw and Mr. Hinshaw suggested that defendant would be valuable to the enterprise because he could make certain that the 400 Spartanburg properties were properly "described and defined for input" into the Orange County computer system.

Defendant and Mr. Hinshaw travelled to Spartanburg on March 14, 1973, and stayed there for two days, during which visit defendant spent some time explaining to Mr. Ebert and his staff "the classification system" for the physical characteristics of the 400 sample parcels of Spartanburg property so that the data could be run on the Orange County computer. Both Mr. Hinshaw and defendant received consulting fees and expenses for the time they spent in Spartanburg. There was evidence of an agreement that if Spartanburg County purchased the SFR package, Mr. Hinshaw would receive an additional sum of $6,000. Thus, Mr. Ebert testified: "Then there was some discussion [with Mr. Hinshaw and defendant at the airport] about what would be the fee if I did accept the program, the Orange County system, if I did in fact employ it if I found the results [of the test run of data as to 400 sample Spartanburg properties] to my satisfaction and I agreed to pay Mr. Hinshaw $6,000 with regard to his services if I proceeded with the acquisition of the Orange County program."

To assure that Spartanburg County would purchase the SFR package, defendant arranged for and implemented the test run of Spartanburg's data relating to 400 sample properties, using the facilities and employees of the Orange County Assessor's office. There was evidence that defendant's office had never before performed such a service with respect to property outside of Orange County.

The logical question which arises from this evidence is why defendant made such an effort to assure the sale of the SFR package to Spartanburg County. The evidence shows that after Spartanburg County purchased the SFR package, it paid Mr. Hinshaw the sum of $6,000, although Spartanburg County in fact required no further significant services from Mr. Hinshaw. Mr. Hinshaw promptly paid the sum of $3,000 to defendant.

Mr. Ebert testified to the effect that Mr. Hinshaw would have no right to the sum of $6,000 as a consulting fee unless Spartanburg County purchased the SFR package. In the light of the other evidence outlined above, the jury could reasonably conclude that Mr. Hinshaw solicited defendant's assistance in implementing the sale of the SFR package to Spartanburg County by promising to split the fee of $6,000 with defendant should the sale be effected. Accordingly, under that view of the evidence, at the time Spartanburg County issued its purchase order to Orange County for the SFR package, defendant had the type of personal financial interest in the contract of sale proscribed by Government Code section 1090, to wit: the anticipated receipt of half of the sum of $6,000 from Mr. Hinshaw.

While defendant's financial interest in the contract was indirect, it was not a "remote" interest as that term is defined in Government Code section 1091. The jury was properly instructed as follows: "The interest is indirect when the county officer makes a contract in his official capacity with an individual or entity, which individual or entity, by reason of the county officer's relationship to the individual or entity at the time the contract is made, is in a position to render actual or *potential* pecuniary benefits directly or *indirectly* to the county officer based on the making of the contract."[4] As was said by the court in *People* v. *Deysher,* 2 Cal.2d 141, at page 146 [40 P.2d 259], quoting from *City of Northport* v. *Northport Townsite Co.,* 27 Wash. 543 [68 P. 204]: " 'However devious and winding the chain may be which connects the officer with the forbidden contract, if it can be followed and the connection made, the contract is void.' "[5]

---

[4] A similar instruction was approved by the court in *People* v. *Watson, supra,* 15 Cal.App.3d 28, at pages 37-38. (See also *People* v. *Darby, supra,* 114 Cal.App.2d 412, 433, fn. 4.)

[5] If defendant had done no more in this case than perform the consulting services rendered by him in Spartanburg on March 14 through March 16, 1973, and accepted in payment therefor the sum of $714 tendered by Spartanburg County for fees and expenses, no conflict of interest within the meaning of Government Code section 1090 would have been shown. The interest proscribed by Government Code section 1090 is an

■  Defendant next contends that the evidence was insufficient to show that the contract was one "made" by him in his official capacity as Assessor of Orange County. He states in his opening brief: "No contract was 'made' by the Assessor of Orange County with the County of Spartanburg. The contract was made by the County of Spartanburg with the County of Orange (as distinguished from its assessor) by Spartanburg accepting in April, 1973, Orange County's offer to sell made to the entire world in November, 1970, and never rescinded."

■  As was said by the court in *Millbrae Assn. for Residential Survival v. City of Millbrae, supra,* 262 Cal.App.2d 222, at page 237: "Although section 1090 refers to a contract 'made' by the officer or employee, the word 'made' is not used in the statute in its narrower and technical contract sense but is used in the broad sense to encompass such embodiments in the making of a contract as preliminary discussions, negotiations, compromises, reasoning, planning, drawing of plans and specifications and solicitation for bids." (See *Stigall v. City of Taft,* 58 Cal.2d 565, 571 [25 Cal.Rptr. 441, 375 P.2d 289].) In *People v. Sobel,* 40 Cal.App.3d 1046 [115 Cal.Rptr. 532], a deputy purchasing agent for the County of Los Angeles argued that Government Code section 1090 was not applicable to him because he was without legal capacity to execute contracts with vendors. The appellate court disagreed, stating (40 Cal.App.3d at p. 1052): "The decisional law, therefore, has not interpreted section 1090 in a hypertechnical manner, but holds that an official (or a public employee) may be convicted of violation no matter whether he actually participated personally in the execution of the questioned contract, if it is established that he had the opportunity to, and did, influence execution directly or indirectly to promote his personal interests. (See *People v. Watson,* 15 Cal.App.3d 28 [92 Cal.Rptr. 860].)"

■  In the present case the Orange County Board of Supervisors, in the minutes pertaining to the meeting of November 10, 1970, authorized the "assessor" to "release" the SFR package to anyone who was interested, for a price of $2,045. The evidence is clear that the only contacts Mr. Ebert had with Orange County with respect to the purchase

---

interest in the contract. The purpose of the prohibition is to prevent a situation where a public official would stand to gain or lose something with respect to the making of a contract over which in his official capacity he could exercise some influence. Defendant's consulting services were performed and the fee for them earned prior to the execution of the contract, and the evidence would support an inference that defendant was to be paid for those services whether or not the contract was consummated.

We do not intend by this footnote to make any blanket determination of the legality of outside consulting services rendered by public officials.

of the SFR package were contacts with defendant and members of his staff. All preliminary discussions and negotiations with respect to the purchase of the SFR package were had by Mr. Ebert with Mr. Hinshaw and defendant.

Defendant contends, however, that the contract was "made by operation of law" because the terms were set by the board of supervisors and that he "played no discretionary role in effecting the sale," citing *Capital Gas Co.* v. *Young,* 109 Cal. 140 [41 P. 869], and *Hotchkiss* v. *Moran,* 109 Cal.App. 321 [293 P. 148]. But we observe that the evidence is to the contrary. Spartanburg County insisted upon the performance of a condition prior to purchasing the SFR package. Spartanburg County wanted a test run of the data relating to the sample of 400 Spartanburg properties on the Orange County computer system and only defendant in his official capacity as assessor had the power to fulfill that condition. Thus, defendant clearly had the opportunity and ability, which he used, to influence the execution of the contract within the meaning of Government Code section 1090.

Defendant contends that the crime defined in Government Code section 1090 cannot occur in connection with a sale-purchase contract between two county governments. In support of this proposition he cites an opinion of the California Attorney General (55 Ops.Cal.Atty.Gen. 36), wherein the Attorney General determined that "the offices of president and member of the board of trustees of the Santa Ynez Water District, Improvement District No. 1, and member of the board of directors of the Solvang Municipal Improvement District are incompatible" by reason of contracts between the districts for the collection, distribution and sale of water. The Attorney General commented that he had been informed that when such contracts were entered into between the districts, the individual who held dual offices on both boards took care to follow the disclosure and abstinence from voting procedures provided for in the conflict of interest statutes (Gov. Code, § 1090 et seq.). The Attorney General stated as follows: "The difficulty with such a position, however, is that the conflict of interest statutes have not to our knowledge been applied to the situation where an individual acts in two *public* capacities. They are designed to protect against an individual acting in both a public capacity and in a private capacity. When the official is acting solely for the public on both sides, the common law doctrine of incompatibility of offices is applicable; when he is acting for the public on one side and for some private interest on the other, the statutory and common law conflict of interest principles are applicable."

■ Of course, the opinions of the California Attorney General are advisory only and do not carry the weight of law. We note that the provisions of Government Code section 1090 forbid a financial interest "in any contract made" by a county officer in his official capacity. There is no suggestion in the statutory language that section 1090 is not applicable to a situation such as the one before this court where an official has a private financial interest in a contract made by him in his official capacity with another governmental entity.

Ignoring the facts relative to the payment of the sum of $3,000 to him by Mr. Hinshaw, defendant states in his brief: "This is the first case in which a public official has been convicted for having a conflict of interest because he earned a consulting fee by explaining to one governmental entity how it might benefit from buying a freely available item of merchandise from the governmental entity which he regularly served." However, the gravamen of the conflict of interest proved in this case was not the acceptance by defendant of the initial consulting fee embodied in the sum of $714. (See fn. 5, *ante.*) It was also clear that the forbidden financial interest held by defendant in the contract between Orange County and Spartanburg County was purely personal and was not the interest of another governmental agency. It cannot be said that defendant promoted only dual public interests and not his own personal interest with respect to the making of the contract in question.

■ Turning to defendant's motion for a judgment of acquittal made at the close of the People's case, he presented, out of the presence of the jury, the testimony of John Knowles, staff legal counsel of the State Board of Equalization, respecting his opinion as to the legality of "moonlighting" by employees of the board of equalization. Defendant also presented a letter received by defendant in early March 1973 from Robert Campbell-Taylor, a mineral appraiser in the Kern County Assessor's office, wherein Mr. Campbell-Taylor offered his consulting services to the Orange County Assessor's office for a fee. The trial court declined to allow this evidence to be put before the jury. Defendant contends that in so ruling the trial court committed prejudicial error.

Insofar as the rejected evidence constituted opinion testimony concerning the proper legal construction of the conflict of interest law, it was properly excluded from the jury's consideration. Questions of law are to be decided by the court, not the jury. (*Chiappe* v. *Eichenbaum,* 169 Cal.App.2d 46, 53 [336 P.2d 1045]; Evid. Code, § 310.) Furthermore, the evidence was only relevant with respect to the question of whether

defendant acted properly in performing outside consulting services for a fee. Since the rejected evidence was not pertinent to the gravamen of the offense charged here, its exclusion was not prejudicial.

With respect to the instructions given to the jury in connection with a conflict of interest count, defendant complains that the "jury was never told that a contract between defendant's county and another county government was not comprehended by the conflict of interest statutes." However, as we have noted hereinabove, defendant's proposed interpretation of Government Code section 1090, that is, as excluding contracts between two governmental agencies, is not a correct statement of the law and, accordingly, the trial court did not err.

Defendant also complains that the jury was not instructed that an official does not "make" a contract where the provisions of the contract are determined by operation of law. However, as noted previously in this opinion, the facts in this case simply do not support defendant's claim with respect to the applicability of the legal theory set forth in *Capital Gas Co.* v. *Young, supra,* 109 Cal. 140, and *Hotchkiss* v. *Moran, supra,* 109 Cal.App. 321.

*Convictions on the Various Counts Charging*
*Violations of Penal Code Section 424*

Counts II through V of the indictment charged violations of various subdivisions of Penal Code section 424. Counts II through IV concerned the facts relating to the purchase of and payment for defendant's round-trip flight from Los Angeles to Washington, D.C., and Spartanburg. Count V concerned the facts surrounding defendant's receipt of the $3,000 check from Mr. Hinshaw.

With respect to the propriety of the convictions under Penal Code section 424, defendant presents several general legal arguments to which we will address ourselves first. He contends that "Penal Code § 424 was erroneously applied to the County Assessor, who is an elected official not charged with the receipt, safekeeping, transfer, or disbursement of public moneys." He also contends that it was not shown that "he was in possession or control of *moneys* as distinguished from services or other kinds of property" nor that "the moneys belonged to the *public,* as distinguished from the defendant or any third person."

Defendant testified that he instructed his secretary to order an airline ticket for him for his flight to Washington, D.C., and Spartanburg. The ticket was ordered from World Travel Bureau, Inc., which company handled the travel account for the Orange County Assessor's office. Exhibit 26, a copy of the coupon retained by World Travel Bureau with respect to the airline ticket in question, shows that the ticket was issued in the name of "Mr. J. Vallerga." The cost of the ticket was billed to "Orange County Assessors" by World Travel Bureau, Inc.'s invoice No. 017454 dated March 12, 1973. Laura Hagen, an employee of the Orange County Assessor's office, went to World Travel Bureau on March 12, 1973, picked up the ticket, and signed her name to the invoice. The Orange County Assessor's office had two transportation accounts. The "270 account" covered meetings and conferences. The "260 account" was for general travel and for expenses relating to audits. Approximately $140,000 was budgeted for the "260 account" and approximately $12,000 for the "270 account," "depending upon the year." The World Travel Bureau invoice with respect to the airline ticket issued in defendant's name was billed to the "260 account." Defendant testified that as the department head for audits, he was authorized to expend the funds within the "260 account" as he saw fit.

■ Actual possession of public funds by the official sought to be charged with a violation under Penal Code section 424 is unnecessary. As was said by the court in *People* v. *Qui Mei Lee,* 48 Cal.App.3d 516, at page 523 [122 Cal.Rptr. 43]: "No express language in [Penal Code] section 424 restricts its application to cases where the public officer's duties include the possession of public funds. The history of section 424, as reviewed in the *Dillon* case [*People* v. *Dillon,* 199 Cal. 1 (248 P. 230)], leaves no doubt that the section was also intended to cover instances where the officer was merely charged with the duty of controlling such funds." (See *People* v. *Sperl,* 54 Cal.App.3d 640, 658-659 [126 Cal.Rptr. 907].) Defendant herein testified that as the department head for audits he was authorized to expend the funds within the county assessor's "260 account" as he saw fit. Thus he had control over public moneys.

Defendant contends that the interpretation of Penal Code section 424 set forth in *People* v. *Qui Mei Lee, supra,* 48 Cal.App.3d 516, and *People* v. *Sperl, supra,* 54 Cal.App.3d 640, is contrary to the interpretation given to that section in *People* v. *Dillon,* 199 Cal. 1 [248 P. 230]. It is his contention that Penal Code section 424 is only applicable to an official such as a treasurer whose official duties are concerned primarily with the receipt and disbursement of public moneys. In *People* v. *Dillon, supra,*

the defendant was the Commissioner of Finance of the City of Fresno and by virtue of his office he also performed the duties of city purchasing agent. As such officer he was able to obtain discounts on contracts for the purchase of materials and supplies made by him for the use of the city. Defendant Dillon was convicted of violations of Penal Code section 424, subdivisions 1 and 2, because he made purchases of auto tires and auto accessories for the private use and benefit of a number of the city's officers and employees. The goods were paid for by warrants drawn on the city treasury and signed by Dillon, which allowed the purchasers to take advantage of the city's discount. The purchasers then reimbursed the city for the cost of the goods.

On appeal Dillon contended that "it was not the legislative intent that section 424 should be applied to the facts" of that case, but that "the case is ruled by sections 503 and 504 of the Penal Code" relating to embezzlement of public property. The court made an extensive analysis of the provisions of Penal Code section 424 and its relationship to Penal Code section 504, noting that section 504 "merely defines embezzlement and fixes the punishment of both public and private corporate officers who may commit the offense as therein described." (199 Cal. at p. 6.) The court in *Dillon* stressed the differences between the offense proscribed by Penal Code section 504 and those offenses defined in Penal Code section 424, stating: "It is clear that the said section [Pen. Code, § 424] has to do solely with the protection and safekeeping of public moneys as defined by section 426 of the Penal Code, and with the duties of the public officer charged with its custody or control and with *no other kind of public property.*" (Court's italics.) (199 Cal. at p. 5.) The court also stated that Penal Code section 424 did not require a fraudulent intent on the part of the officer charged as did embezzlement under Penal Code section 504.

It is clear that the court in *Dillon* was attempting to emphasize that the offenses defined in Penal Code section 424 were offenses relating to "public moneys" as opposed to the broader "public property" designation in Penal Code section 504. Defendant's contention that *Dillon* stands for the proposition that only public officers charged by law with actual possession of public funds are subject to Penal Code section 424 is not supported by a fair reading of that opinion. (*People* v. *Qui Mei Lee, supra,* 48 Cal.App.3d 516, 522-523; *People* v. *Sperl, supra,* 54 Cal.App.3d 640, 658-659.) Our conclusion in this respect is supported by the Supreme Court's recent citation of the *Dillon* case in *Stanson* v. *Mott,* 17 Cal.3d 206, at page 225 [130 Cal.Rptr. 697, 551 P.2d 1], wherein the court

stated: "We recognize, of course, that public officials who either retain custody of public funds *or are authorized to direct the expenditure of such funds* bear a peculiar and very grave public responsibility, and that courts and legislatures, mindful of the need to protect the public treasury, have traditionally imposed stringent standards upon *such* officials. (See, e.g., Pen. Code, § 424; *People* v. *Dillon* (1926) 199 Cal. 1, 12-15 [248 P. 230]; *Bird* v. *McGoldrick* (1938) 277 N.Y. 492 [14 N.E.2d 805, 806-807, 116 A.L.R. 1059] (Lehman, J.).)" (Italics added.)

▆▆ Defendant next contends that his conviction with respect to counts II and III of the indictment was unsupported by the evidence because there was no proof that he misappropriated any "moneys." Counts II and III charged that on or about March 12, 1973, defendant unlawfully appropriated public moneys to his own use in violation of Penal Code section 424, subdivision 1, and used such public moneys for an unlawful purpose, that is, to purchase an airline ticket for his personal use and benefit in violation of Penal Code section 424, subdivision 2. The evidence supports the jury's conclusion that his trip to Washington and Spartanburg was not for the purpose of conducting official business as the Assessor of Orange County but, rather, was for the purpose of rendering private consulting services to Spartanburg County for defendant's personal financial gain. The proof was that public money was used to pay for his airline fare for the flight from Los Angeles to Washington, D.C., and Spartanburg, and return to Los Angeles. Defendant's conviction under counts II and III of the indictment was supported by the evidence.

▆▆ Defendant contends that the moneys involved in counts IV and V were not public moneys within the meaning of Penal Code section 424. Counts IV and V of the indictment charged defendant with separate violations of subdivision 7 of Penal Code section 424. That subdivision provides in pertinent part as follows: "Each officer . . . of any county . . . and every other person charged with the receipt, safekeeping, transfer, or disbursement of public moneys, who . . . [¶] 7. Willfully omits or refuses to pay over to any officer or person authorized by law to receive the same any money received by him under any duty imposed by law so to pay over the same;—[¶] Is punishable . . . ."

Count IV refers to defendant's omission to pay over to the Orange County treasurer money received by him as reimbursement for the purchase of airline transportation which had been paid for by the County of Orange. The bill submitted by defendant to Mr. Ebert as

Assessor of Spartanburg County set forth defendant's consulting fee at the rate of $200 per day for 1¾ days, a total of $350. The bill also set forth a per diem charge of $40 per day, a total of $80, and the charge for "Travel (Round Trip to Spartanburg)—$284.00." Defendant's bill for services and expenses was paid by Spartanburg County by a check in the total amount of $714. As noted hereinabove, Orange County had previously paid for defendant's round-trip airline ticket to Spartanburg. The question presented with respect to the propriety of defendant's conviction for a violation of subdivision 7 of Penal Code section 424 is whether, under the circumstances, at the time defendant received Spartanburg County's check in the amount of $714 he was under a duty imposed by law to pay over that portion of the amount allocated to the cost of his airfare to the Treasurer of Orange County to reimburse the county for moneys expended by the county to purchase his round-trip ticket.

Subdivision 7 of Penal Code section 424 is not only concerned with the receipt by an officer of "public moneys."[6] Subdivision 7 proscribes the wilfull refusal or omission to pay over to any officer or person authorized by law to receive the same "any money" received by an officer "under any duty imposed by law so to pay over the same." Defendant was, of course, under a duty to reimburse the county for the cost of his airfare when the purpose of his trip was for his own personal profit. (See *Stanson* v. *Mott, supra,* 17 Cal.3d 206, 227.)

The facts upon which the charge in count V was based were those surrounding the receipt by defendant of the sum of $3,000 from Mr. Hinshaw. As noted previously, the jury could reasonably conclude that Mr. Hinshaw paid defendant that sum in return for his work in implementing the sale of the SFR package to Spartanburg County, which included setting up and performing a test run for Spartanburg County by use of Orange County facilities, equipment and personnel. The work by defendant in directing and implementing the test run and in promoting the sale of the SFR package to Spartanburg County was all done in Orange County and was within the scope of his duties as the county assessor. The jury was instructed as follows: "Any compensation which a county officer may receive in return for services which he performs within the scope of his official duties, except the compensation

[6]Penal Code section 425 pertains to the failure of an officer to pay over public moneys and it specifically provides as follows: "Every officer charged with the receipt, safe keeping, or disbursement of public moneys, who neglects or fails to keep and pay over the same in the manner prescribed by law is guilty of a felony."

which is due to him from the county, belongs to the county, even though acquired unlawfully." (Cf. Lab. Code, § 2860.) Under the law as expressed in that instruction, when defendant received the sum of $3,000 from Mr. Hinshaw he was under a duty to pay that amount over to Orange County. His wilful omission so to do constituted a violation of Penal Code section 424, subdivision 7.

Turning specifically to defendant's objections to the instruction quoted above, which was based on the language of Labor Code section 2860, it is to be noted that Labor Code section 2860 is as follows: "Everything which an employee acquires by virtue of his employment, except the compensation which is due to him from his employer, belongs to the employer, whether acquired lawfully or unlawfully, or during or after the expiration of the term of his employment." In *Southern Cal. Disinfecting Co.* v. *Lomkin,* 183 Cal.App.2d 431, at page 444 [7 Cal.Rptr. 43], the court stated: "Referring to the statute [Lab. Code, § 2860], it is stated in 32 California Jurisprudence 2d 417, section 18: [¶] '. . . This statute is merely an expression of the familiar principle that forbids an agent or trustee to use the trust property or powers conferred on him for his own benefit.' [¶] An agent must not put himself in a position, with reference to the business, where his interests are contrary and antagonistic to the employer. In 2 California Jurisprudence 2d 775, section 106 it is stated: [¶] '. . . This means that the agent is not permitted to obtain any advantage over his principal by the slightest misrepresentation, concealment, threat, or adverse pressure of any kind. He may not use or deal with the subject matter of the agency for his own profit, or for any purpose unconnected with the agency in any manner.' "

As defendant points out, the Labor Code section does not relate specifically to elected officials. We have not found any case applying that statute in a manner similar to that employed here. ▮ However, defendant acting in his capacity as Assessor of Orange County, without question acted as an agent of the county as well as a trustee with respect to the facilities and powers entrusted to him as a public officer. (*Spreckels* v. *Graham,* 194 Cal. 516, 529-530 [228 P. 1040]; *Logan* v. *Shields,* 190 Cal. 661, 664 [214 P. 45].) Accordingly, we hold that the basic legal principles applicable to such relationships were applicable to him and that the instruction complained of was a correct statement of a pertinent principle.

In the somewhat analogous case of *Terry* v. *Bender, supra,* 143 Cal.App.2d 198, a taxpayer brought suit to enjoin payment of a warrant

in the amount of $15,095.74 authorized by the City Council of Compton and made payable to John T. Bender, who had been employed by the City of Compton as a special city attorney for the purpose of rehabilitating tax deeded and special assessment frozen properties situated within the city. In the second count of plaintiff's complaint it was alleged that Bender made secret profits at the city's expense by purchasing through dummies city property at grossly undervalued prices because of his misrepresentations to the city council, and that while special city attorney he represented and received fees from a private client with an interest adverse to the city, and by his misrepresentations to the city enabled that client to purchase city property at a fraction of its value. In holding that the second count stated a cause of action, the court stated (143 Cal.App.2d at pp. 211-212): "A public officer may not make an unauthorized profit out of the particular public business which has been entrusted to his care. An agent stands in a fiduciary relationship to his principal, and if he makes a secret profit from the subject matter of his agency, the principal may recover such profit. [Citations.] . . . A faithless trustee must disgorge to his principal the secret profits and *unauthorized benefits* and advantages he has acquired as an outgrowth of the agency. [Citation.]"

Defendant's argument that the effect of the "Labor Code instruction" was to "instruct the jury that it might convert an employee's legitimate moonlighting fees into public monies which were stolen from the county" is based on a mischaracterization of the facts. Defendant characterizes the sum of $3,000 received by him from Mr. Hinshaw as a payment for "legitimate moonlighting" services rendered to Spartanburg County. However, the evidence lends no support to that characterization. The only fee paid by Spartanburg County to defendant for outside consulting services was embodied in the sum of $714 paid in April 1973. The sum of $3,000 was paid to defendant personally by Mr. Hinshaw for defendant's work in implementing the sale of the SFR package to Spartanburg County. Defendant performed the test run for Spartanburg County in his official capacity as Assessor of Orange County, using Orange County facilities and Orange County personnel.

*Conviction Based on*
*Grand Theft, Count VII*

Defendant contends that "[n]either misappropriation nor embezzlement of public funds was proved under Counts V and VII." The sufficiency of the evidence with respect to defendant's conviction of the

charge involved in count V has been discussed hereinabove. With respect to count VII defendant contends, as he did with respect to count V, that "There was a total failure of proof that the $3,000 check belonged to Orange County" and that the trial court erred in giving the jury the instruction based on the language of Labor Code section 2860. Those contentions have been previously considered hereinabove and have been determined to be untenable. It should be noted that the jury was fully instructed as to the nature of the specific intent required for a conviction of the crime charged in count VII.

### Failure to Instruct on a Claimed Lesser Included Offense

Defendant contends that the trial court "failed in its duty, *sua sponte,* to instruct on the lesser included offense of receiving a gratuity [Pen. Code, § 70], a misdemeanor." It is defendant's contention that the offense proscribed by Penal Code section 70 was a lesser but necessarily included offense with respect to the crimes charged in counts IV, V and VII.

In *People* v. *Sedeno,* 10 Cal.3d 703, at pages 715-716 [112 Cal.Rptr. 1, 518 P.2d 913], the court stated: " 'It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence. [Citations.] The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case.' [Citation.] That obligation has been held to include giving instructions on lesser included offenses when the evidence raises a question as to whether all of the elements of the charged offense were present (see, e.g., *People* v. *Hood* (1969) 1 Cal.3d 444 [82 Cal.Rptr. 618, 462 P.2d 370]), but not when there is no evidence that the offense was less than that charged. (*People* v. *Noah* (1971) 5 Cal.3d 469, 479 [96 Cal.Rptr. 441, 487 P.2d 1009]; *People* v. *Osuna* (1969) 70 Cal.2d 759, 767 [76 Cal.Rptr. 462, 452 P.2d 678].) The obligation to instruct on lesser included offenses exists even when as a matter of trial tactics a defendant not only fails to request the instruction but expressly objects to its being given. [Fn. omitted.] (*People* v. *Mosher* (1969) 1 Cal.3d 379, 393 [82 Cal.Rptr. 379, 461 P.2d 659]; *People* v. *Graham* (1969) 71 Cal.2d 303, 319 [78 Cal.Rptr. 217, 455 P.2d 153].) Just as the People have no legitimate interest in obtaining a conviction of a greater offense than that established by the evidence, a defendant has no

right to an acquittal when that evidence is sufficient to establish a lesser included offense. (*People* v. *St. Martin, supra,* 1 Cal.3d 524, 533.)"

Accordingly, we must consider whether the crime charged in Penal Code section 70 was necessarily included in the offenses charged in counts IV, V and VII of the indictment. In *People* v. *St. Martin,* 1 Cal.3d 524 [83 Cal.Rptr. 166, 463 P.2d 390], the court stated (p. 536): "Two different types of necessarily included offenses have been recognized in this state. First, where one offense cannot be committed without committing another offense, the latter offense is a necessarily included offense. [Citation.] Second, a lesser offense is necessarily included if it is within the offense specifically charged in the accusatory pleading, as distinguished from the statutory definition of the crime. [Citations.]" (See *People* v. *Orr,* 43 Cal.App.3d 666, 673 [117 Cal.Rptr. 738].)

Penal Code section 70 provides in pertinent part as follows: "Every executive or ministerial officer, employee or appointee of the State of California, county or city therein or political subdivision thereof, who knowingly asks, receives or agrees to receive any emolument, gratuity or reward, or any promise thereof excepting such as may be authorized by law for doing an official act, is guilty of a misdemeanor."

It is manifest that under the first test, Penal Code section 70 does not constitute a lesser but necessarily included offense with respect to the crime defined in Penal Code section 424, subdivision 7, or with respect to the crimes defined in Penal Code sections 484, 487 and 504. In committing a crime defined in Penal Code section 424, subdivision 7, the offender does not necessarily receive a gratuity within the meaning of Penal Code section 70. Grand theft (Pen. Code, §§ 484, 487, 504) can likewise be committed without necessarily committing the offense defined in Penal Code section 70. We must then determine whether a violation of Penal Code section 70 is within the offenses specifically charged in the accusatory pleading.

Defendant was charged in counts IV, V and VII of the indictment as follows: "COUNT IV: The Grand Jury of the County of Orange, State of California, by this fourth count of this Indictment, hereby further accuses JACK VALLERGA of a Felony, to-wit: Violation of Section 424(7) of the Penal Code of the State of California, in that on or about the 9th day of April, 1973, in the County of Orange, State of California, the said JACK VALLERGA was Assessor of Orange County, California, and as such was charged with the receipt and safekeeping of public monies, to-wit:

funds of the County of Orange, and did willfully omit and refuse to pay over to the Treasurer of the County of Orange, California, money received by him under a duty imposed by law to pay over the same, to-wit: money received by him as reimbursement for purchase of airline tickets, which airline tickets were purchased by the County of Orange. [¶] COUNT V: The Grand Jury of the County of Orange, State of California, by this fifth count of this Indictment, hereby further accuses JACK VALLERGA of a Felony, to-wit: Violation of Section 424(7) of the Penal Code of the State of California, in that on or about the 5th day of June, 1973, in the County of Orange, State of California, the said JACK VALLERGA was Assessor of Orange County, California, and as such was charged with the receipt and safekeeping of public monies, to-wit: funds of the County of Orange, and did willfully omit and refuse to pay over to the Treasurer of the County of Orange, California, money received by him under duty imposed by law to pay over the same, to-wit: money received by him for the sale of the Single-family Residential System. . . . [¶] COUNT VII: The Grand Jury of the County of Orange, State of California, by this seventh count of this Indictment, hereby further accuses JACK VALLERGA of a Felony, to-wit: Violation of Sections 484-487 of the Penal Code of the State of California, in that on and between the 12th day of March, 1973, and the 6th day of June, 1973, in the County of Orange, State of California, and while said defendant was Assessor of the County of Orange, California, he did unlawfully and fraudulently appropriate to a use and purpose not in the due and lawful execution of his trust, property which he had in his possession and under his control by virtue of his trust and did willfully and unlawfully secrete said property with a fraudulent intent to appropriate it to such a use and purpose, contrary to Penal Code Section 504, said property being of a value exceeding two hundred dollars ($200.00). [¶] It is further alleged that the said embezzlement and defalcation was of the public funds of the County of Orange, California, within the meaning of Penal Code Section 514."

    With respect to the crime charged in count IV, under no theory could the evidence be said to show that the money received by defendant as reimbursement for the purchase of airline tickets, which airline tickets were purchased by the County of Orange, constituted receipt by defendant of a gratuity within the meaning of Penal Code section 70.

    Counts V and VII related to the receipt by defendant of the sum of $3,000 from Mr. Hinshaw. As noted previously, the evidence supported the inference that that sum was paid to defendant in return for extra

services rendered to Spartanburg County in connection with the sale of the SFR package. The acts charged in counts V and VII and the facts proved by the prosecution in support of those counts included the receipt and retention by defendant of money which defendant was under a duty to pay over to the county because it was given to him in exchange for services performed by him in his official capacity as county assessor. In *People* v. *Sullivan*, 113 Cal.App.2d 510 [248 P.2d 520], appellants were charged with conspiracy to commit acts injurious to the public morals, to pervert or obstruct justice or the due administration of the laws. It was charged that Doris Sullivan, the City Manager of National City, agreed with the other appellants to use her influence to persuade the city council to enact a zoning variance for the private gain of appellants in return for a substantial sum of money. After quoting the provisions of Penal Code section 70, the court stated (113 Cal.App.2d at p. 522): "In the instant case the evidence shows that defendant Sullivan, as city manager, was required by law to see that all laws and ordinances of the city were duly enforced, to attend all council meetings and to recommend for adoption such measures and ordinances as were deemed necessary or expedient. It was her official duty to present the petition for variance to the planning commission and city council. The record contains substantial evidence showing that for the performance of these official acts she unlawfully received substantial sums of money pursuant to agreement with her codefendants. Under such circumstances the evidence is sufficient to show a violation of section 70 of the Penal Code and the indictment sufficiently charges a conspiracy to violate section 182 of the same code."

An essential part of the crimes charged in counts V and VII was the receipt and retention of moneys from a person or entity other than the County of Orange in exchange for services performed by defendant in his official capacity as county assessor. However, assuming that under the circumstances of this case a violation of Penal Code section 70 might constitute a lesser but necessarily included offense, as will be explained we hold that no error resulted from the trial court's failure to instruct on such lesser included offense.

At the time of oral argument the Attorney General contended that the trial court did not err in failing to instruct the jury with respect to a violation of Penal Code section 70, a misdemeanor, as a lesser but necessarily included offense, because the one-year statute of limitations barred prosecution therefor. (Pen. Code, § 801.) The indictment was returned on May 6, 1975, slightly less than two years after the occurrence of the acts charged in counts V and VII.

As stated by the court in *People* v. *Rehman,* 62 Cal.2d 135, at page 139 [41 Cal.Rptr. 457, 396 P.2d 913]: "The statute of limitations is jurisdictional, and an indictment or information which shows on its face that prosecution is barred by the statute of limitations fails to state a public offense. [Citation.]" (See *People* v. *Rose,* 28 Cal.App.3d 415, 417 [104 Cal.Rptr. 702].) Where, as in this case, a charged offense includes a lesser but necessarily included offense which is barred by the statute of limitations, the trial court should not be required to instruct on the lesser offense which in effect does not exist. In *People* v. *McGee,* 1 Cal.2d 611, at page 613 [36 P.2d 378], the court stated: "In criminal cases, the state, through its legislature, has declared that it will not prosecute crimes after the period has run, and hence has limited the power of the courts to proceed in the matter. [Citations.] It follows that where the pleading of the state shows that the period of the statute of limitations has run, and nothing is alleged to take the case out of the statute, . . . the power to proceed in the case is gone."

While no California case directly deciding the point has come to our attention, cases from other jurisdictions have decided the matter in accord with the conclusion that an instruction on the lesser offense is not appropriate. In *Chaifetz* v. *United States,* 288 F.2d 133 [109 App.D.C. 349] (reversed in part on other grounds 366 U.S. 209 [6 L.Ed.2d 233, 81 S.Ct. 1051]), the defendant was convicted of wilfully attempting to evade federal income taxes by filing a false and fraudulent income tax return. The defendant assigned as error the fact that the trial court refused his requested instruction relating to the misdemeanor of failing to supply required information, a lesser but necessarily included offense. At the time the indictment was returned the statute of limitations had run on the lesser included offense. In holding that the trial court did not err in failing to instruct the jury on the lesser included offense, the appellate court stated as follows (288 F.2d at p. 136): "Since Chaifetz could not, at the time of his trial, have been convicted of the misdemeanor of failing to file required information for the year 1953, he was not entitled to have the trial judge tell the jury it could, or should, find him guilty of that offense. [¶] As we have noted Rule 31(c) of the Rules of Criminal Procedure provides that an accused is entitled to instructions on 'necessarily included' offenses. But that rule is not to be read as conferring a blanket right without qualification. Quite clearly it refers to offenses for which convictions might be had upon the proof adduced. Otherwise it would run counter to all accepted rules as to what a trial judge should or can charge a jury concerning permissible verdicts."

In the more recent case of *Gurley* v. *State* (Ind. 1976) 348 N.E.2d 16, at pages 20-21, the court stated: "The jury was not instructed that it could find the defendant guilty of the lesser included offense of manslaughter, notwithstanding three tendered instructions in this regard. They were refused by the court, because the statute of limitations precluded a prosecution for manslaughter. Ind. Code § 35-1-3-4 (Burns 1975). [¶] We find no Indiana case discussing the propriety of instructing a jury upon a lesser included offense for which the statute of limitations had run. The weight of authority from other jurisdictions is that if the defendant could not be convicted of the lesser included offense, the instructions upon such offense are properly refused. *Chaifetz* v. *United States* (1960) 109 U.S. App.D.C. 349, 288 F.2d 133, *reversed on other grounds* (1961) 366 U.S. 209, 81 S.Ct. 1051, 6 L.Ed.2d 233; *People* v. *Lohnes* (1973) 76 Misc.2d 507, 351 N.Y.S.2d 279; Annotation 47 A.L.R.2d 887 (1956)."

Accordingly, we hold that the trial court did not err in failing to instruct the jury with respect to a necessarily included offense as defined in Penal Code section 70.

### *Alleged Misconduct by the Prosecutor Affords No Ground for Reversal Herein*

■ Defendant contends that "[t]he indictment should have been quashed because the prosecutor withheld from the grand jury's knowledge important exculpatory material and purposely cast defendant in a false bad light." In his brief defendant states that the district attorney obtained the indictment which formed the subject matter of this case and "a related criminal accusation (to remove defendant from public office) on the same day from the same grand jury." He states further that in connection with the accusation the prosecutor presented an admission made by defendant that was a part of a telephone conversation between defendant and the prosecutor, which had been secretly tape recorded by an investigator for the prosecutor, without disclosing to the grand jury "the lengthy exculpatory statement made by defendant in the conversation." Relying on *Johnson* v. *Superior Court,* 15 Cal.3d 248 [124 Cal.Rptr. 32, 539 P.2d 792], defendant contends that "[t]he indictment should be quashed."

While we are hampered in addressing ourselves to defendant's contention by the fact that the record of the grand jury proceedings was not made a part of the record on this appeal, a transcript of the taped telephone conversation is attached to defendant's motion to quash or set

aside the indictment which was denied by the trial court prior to the trial herein. It appears from the exhibits attached to defendant's motion to quash that on the day on which the indictment in this case was handed down, the Orange County Grand Jury also returned an accusation against defendant, the first count of which charged defendant with a violation of Government Code section 3060 in that on or about March 28, 1975, he "failed to assess the mandatory penalty required by Revenue and Taxation Code section 504 on escaped assessments of the Tandy Corporation."

We have carefully read the transcript of the telephone conversation which took place between Deputy District Attorney Capizzi and defendant, and it is clear that that conversation was solely concerned with the facts surrounding the charge contained in count I of the accusation relating to defendant's failure to assess the mandatory penalty on escaped assessments against the Tandy Corporation. Not one fact or incident referred to in the telephone conversation had any bearing on the charges contained in the indictment in this case. Even assuming that misconduct on the part of the district attorney was shown with respect to introduction of a part of the taped telephone conversation, it could have no bearing on the indictment returned herein. *Johnson* v. *Superior Court, supra,* 15 Cal.3d 248, cited by defendant, is clearly inapposite.

Defendant also charges the prosecutor with misconduct during the trial of this matter in connection with the cross-examination of one of the defense witnesses, Andrew J. Hinshaw. The first instance of such misconduct cited by defendant is substantially as follows. Mr. Capizzi, the deputy district attorney, questioned Mr. Hinshaw as to his knowledge respecting the bringing of charges against defendant on May 6, 1975. Mr. Capizzi then asked the following question: "And did you ever report to any authorities in Orange County, your role and participation relative to these events?" Mr. Hinshaw answered, "No," and defense counsel objected to the question. The trial court sustained trial counsel's objection and, it being five minutes after 12 o'clock, dismissed the jury for the noon recess.

A lengthy colloquy between court and counsel thereafter ensued, during which the court reprimanded the deputy district attorney for questioning Mr. Hinshaw in that manner and stressed the importance of avoiding questions that might elicit answers indicating that Mr. Hinshaw was also being investigated or had been charged with violations of the law. The trial court asked defense counsel if he had "any motions."

Defense counsel replied that he wished to discuss the matter with defendant. After the recess, the court and counsel again discussed the matter outside the presence of the jury. Defense counsel stated that he did not wish to make a motion for mistrial, but he requested that the court "grant a motion for mistrial on the Court's own motion which would be tantamount to a judgment of acquittal." The trial court refused to do so and defense counsel thereafter requested that the court strike the question and the answer given.

When proceedings in the presence of the jurors were resumed, the court stated as follows: "Ladies and gentlemen, just before the recess there was a series of questions and answers regarding Mr. Hinshaw's awareness of certain proceedings that had taken place as far as Mr. Vallerga's case was concerned. Upon reflection the Court is of the opinion that all of that material was irrelevant. It is ordered stricken from the record and you are admonished to disregard any and all of it as far as it pertains to these proceedings."[7]

■■■ While the question was objectionable, the trial court did not allow the prosecuting attorney to pursue the matter. The trial court's admonition to the jury and the subsequent instruction quoted in footnote 7, *ante,* removed any significant impact the improper question might otherwise have had on the jury. (*People* v. *Lyons,* 50 Cal.2d 245, 263 [324 P.2d 556]; *People* v. *Stuller,* 10 Cal.App.3d 582, 600 [89 Cal.Rptr. 158, 41 A.L.R.3d 712].)

The second incident as to which defendant charges the prosecuting attorney with misconduct relates to a series of questions asked of Mr. Hinshaw on cross-examination respecting whether or not Mr. Hinshaw had been in Orange County at any time between February 1, 1973, and June 5, 1973. Mr. Hinshaw's response to this line of questioning generally was that he did not recall whether he had taken any trips to Orange County during that period. The prosecuting attorney used a document (People's exhibit 37 for identification) apparently prepared by the Clerk of the House of Representatives respecting claims of House members for reimbursement of travel expenses to refresh Mr. Hinshaw's recollection relative to trips to Orange County during the period of February 1, 1973, through June 5, 1973; however, Mr. Hinshaw stated

---

[7]The jury was also subsequently instructed that "[y]ou must not consider for any purpose any offer of evidence that was rejected, or any evidence that was stricken out by the court; such matter is to be treated as though you had never heard of it." (CALJIC No. 1.02.)

that the document did not refresh his recollection. The trial court sustained several objections of defense counsel to various questions asked by the prosecuting attorney as to this subject on the ground of lack of relevancy.

Finally, the trial court dismissed the jury and stated to the prosecuting attorney that it was unable to see the relevance of cross-examining Mr. Hinshaw with respect to "trips between Washington and Orange County during the period involved in these proceedings." Mr. Capizzi expressed his belief that such evidence would tend to impeach Mr. Hinshaw's testimony relative to the necessity for defendant's trip to Washington, stating: "I would submit that there were other opportunities for him to get together in Orange County and it wasn't necessary for Mr. Vallerga to try to go to Washington for the purpose that he has tried to lead us to believe that he went there." However, the court disagreed with Mr. Capizzi and told him, "[D]on't keep asking the same question over and over again after in substance I have ruled against you." Defense counsel did not assign the prosecutor's actions as misconduct, nor did he request the court to admonish the jury.

As was said by the court in *People* v. *Rhinehart,* 9 Cal.3d 139, at page 154 [107 Cal.Rptr. 34, 507 P.2d 642]: "Misconduct has been defined to be a dishonest act or an attempt to persuade the court or jury by the use of deception or reprehensible methods. [Citations.] The burden of proof is on the defendant to show the existence of misconduct. [Citation.]" Irrelevance of questions put to a witness, without more, does not show bad faith on the part of the prosecuting attorney. (*People* v. *Legerretta,* 8 Cal.App.3d 928, 936 [87 Cal.Rptr. 587].) No prejudice because of the charged misconduct was shown by defendant with respect to the second incident described.

The judgment (order granting probation) is affirmed.

Allport, J., and Potter, J., concurred.

A petition for a rehearing was denied March 2, 1977, and appellant's petition for a hearing by the Supreme Court was denied April 28, 1977.